# 14-1411-CV

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT



TIMOTHY M. COHANE,

*Plaintiff-Appellant,*

*v.*

TOM HOSTY, as an NCAA Enforcement Director and as an employee of the NCAA, STEPHANIE HANNA, as an NCAA Enforcement Director and as an employee of the NCAA, JACK FRIEDENTHAL, as an employee of the NCAA, and Former Chairman of

*(Additional Caption On the Reverse)*

_____

*On Appeal from the United States District Court
for the Western District of New York (Buffalo)*

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFF-APPELLANT TIMOTHY M. COHANE

Sean O'Leary, Esq.
SEAN O'LEARY & ASSOCIATES, PLLC
97 Greenpoint Avenue
Brooklyn, New York 11222
718-389-7800

*Attorneys for Plaintiff-Appellant
Timothy M. Cohane*

the NCAA Committee on Infractions, WILLIAM R. GREINER, President of the State University of New York at Buffalo, individually and in his official capacity, DENNIS BLACK, Vice President for Student Affairs individually and in his official capacity, ROBERT ARKEILPANE, Athletic Director, State University of New York at Buffalo, individually and in his official capacity, WILLIAM MAHER, Compliance Director, State University of New York at Buffalo, individually and in his official capacity, ERIC EISENBERG, an employee of State University of New York at Buffalo individually and in his official capacity, MID AMERICAN CONFERENCE, by its commissioner RICK CHRYST, ROBERT FOURNIER, ESQ., NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,

*Defendants-Appellees.*

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF CONTENTS............................................................i

TABLE OF AUTHORITIES ................................................. iii

JURISDICTIONAL STATEMENT ........................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW .....................1

STATEMENT OF THE CASE............................................2

SUMMARY OF THE ARGUMENT AND STANDARD OF REVIEW ................4

ARGUMENT ..........................................................5

I.   <u>STATE ACTION</u> ................................................5

    A.   The District Court Erred By Not Finding That The NCAA Also Engaged In Joint action With SUNY .......................5

    B.   The District Court Erred By Determining, That There Was No Evidence From Which A Reasonable Jury Could Differ That The NCAA Defendants Acted In Concert With SUNY ...............8

    C.   Withholding Exculpatory Evidence Is Corrupt Behavior......................9

II.  <u>ADEQUACY OF PROCESS</u> ........................................11

    A.   The District Court Erred By Use Of Crucial Incorrect Fact.................12

    B.   Jury Could Decide That But For False Information Given To Adjudicators The Findings Would Have Been Overturned And The Penalties Would Have Vacated ...........................13

    C.   Ex parte defamation demonstrates there is a question of fact whether the Infractions Appeal Committee should have vacated the show cause penalty on Cohane .......................15

III.  STIGMA- PLUS ...................................................................17

    A.   The District Court Erred By Determining That The Stay Of
       The Plus (Show Cause Sanction) Eliminated A Tangible
       Burden Upon Employment ....................................................17

    B.   "Show Cause" Satisfies "Plus" ...........................................19

    C.   "Pink File" And Marred Personnel Record Satisfies "Plus" .................23

    D.   Loss of Government Employment Satisfies "Plus".............................25

IV.  SUNY/MAC  LIABILITY ...............................................26

    A.   The District Court Erred By Deciding SUNY And The MAC
       Can Not Be Held Liable For Imposition Of The "Plus ........................26

V.  DOES BRADY APPLY ...................................................28

VI.  FACTUAL BASIS BY DISTRICT COURT IS FLAWED ...........................30

VII.  TORTIOUS INTERFERENCE .......................................................33

V.  CONCLUSION ........................................................................33

## TABLE OF AUTHORITIES

<u>**Cases**</u>

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 (1986)...........................32

*Anemone v. Met Transp. Auth.*, 419 F. Supp. 2d 602, 2006 WL
(S.D.N.Y.2006) .................................................................................................27

*Bass v. Philadelphia*, 4 Pa. D. & C. 3d 39, 1978 WL 248 ....................................29

*Brady v. Maryland*, 273 U.S. 83, 87 (1963) ...........................................................29

*Brandt v. Bd. Of Co-op Educ. Services, Third Supervisory Dist. Suffolk
County, N.Y.*, 820 F.2d 41 (2d Cir. 1987)............................................................19

*Cohane v. NCAA et al. U.S. Dist.  Court West. Dist. Of New York
Magistrate's Report, Recommendation and Order August 8,* 2013 ....................5

*Cohane v. NCAA et al. U.S.  Dist.  Court West. Dist. Of New York Decision
and Order March 10,* 2006 ....................................................................18, 19, 27

*Cohane v. NCAA et al. U.S. Dis. Court West. Dist. Of New York Decision
and Order March 27, 2014* ..........................................................................*passim*

*Cohane v. NCAA et al. U.S. Court of Appeals Second Circuit Summary
Order January 25, 2007*.................................................................................8, 10

*Camarado v. GM Hourly-Rate Empl. Pen. Pl*, 806 F. Supp 380,
1992 WL 340849 ...............................................................................................31

*Davis v.N.N.Y. Spts Off. Cncl.*, 2010 WL 3909688,
(N.D.N.Y. ) Sept. 30, 2010 ..............................................................................18

*Demjanjuk v. Petrovsky*, 10 F.3d 338, 354 (6th Cir 1993) ....................................29

*Dennis v. Sparks*, 449 U.S. 24 (1980).................................................................8, 17

*EEOC v. Los Alamos Constructors*, 382 F.Supp. 1373 (D.N.M., 1974)................29

*Loeffler v. Staten Island Univ. Hosp.,* 582 F. 3d 268, 274 (2d Cir. 2009) ...............4

*NCAA v. Tarkanian*, 488 U.S.179 (1988) ................................................................7, 8

*O'Connor v. Pierson*, 426 F.3d 187 (2005) ...............................................................24

*Patterson v. City of Utica*, 370 F.3d 322 (2d Cir. 2004) ....................................18, 25

*Paul v. Davis*, 424 U.S. 693 (1976) ........................................................................25

*Peres v. Oceanside Union Free Sch. Dist.*, 2008 WL 305342,
    (E.D.N.Y. 2008) ...................................................................................................20

*Seigert v. Gilley*, *500 U.S.* 226 (1991) ................................................................18, 26

*Skiptunas v Mills, et al.*, 2000 WL 14483, (N.D.N.Y., Jan. 5, 2000) ......................26

*Sperry & Hutchinson Co. v. FTC*, 256 F. Supp. 136 (S.D.N.Y. 1966) ...................29

*Trudeau v. N.Y. St. Cons. Prot. Bd.*, 2006 WL 1229018
    (N.D.N.Y. May 4, 2006) .....................................................................................23

*United States v. Edwards*, 777 F. Supp. 2 985 (E.D.N.C., 2011) ...........................29

*Valmonte v. Bane*, 18 F.3d 992 (2nd Cir. 1994) ................................................18, 23

Velez v. Levy, 401 F.3d 75, 89 (2d Cir. 2005) .........................................................27

*Vega v. Lantz, et al.*, 596 F.3d 77 (2d Cir. 2010) ...............................................17, 26

*Walentas v. Lipper*, 862 F. 2d 414 (2d Cir. 1988) ..................................................25

## **Statutes**

28 U.S.C. §§1331, 1343, 1367(a) .............................................................................1

## **Other**

W.D.N.Y. Local Rule 30(a)(3) ................................................................................31

## JURISDICTIONAL STATEMENT

Jurisdiction over the federal claims is conferred on the District Court, Western District of New York pursuant to 28 U.S.C. §1331 and §1343; supplemental jurisdiction over the related states law claim is attained pursuant to 28 U.S.C. §1367.  Pursuant to Fed. R. Civ. P. §1295 the United States Court of Appeals for The Second Circuit shall have exclusive jurisdiction of an appeal from a final decision of a district court of the United States.  On March 28, 2014 The United States District Court, Western District of New York issued an Order granting Summary Judgment to all defendants and dismissing all claims against defendants.  *NDkt 167 A442*.  On April 25, 2014 Appellant filed a timely notice of Appeal.  *Ndkt. 169 A443.*

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

A.    Did the District Court err by use of unsupported facts in making the decision to grant Summary Judgment for defendants State University of New York at Buffalo ("SUNY"), the Mid-American Conference ("MAC") and the National Collegiate Athletic Association ("NCAA").

B.    Did the District Court err by determining that the stay of the "show cause" eliminated a tangible burden upon employment.

C.    Did the District Court err by determining there were no questions of fact as to whether, but for the actions of SUNY and/or the MAC, a plus would have been imposed on Appellant.

D.    Did the District Court err by determining that there was no evidence from which a reasonable jury could differ that the NCAA defendants acted in

concert with SUNY in suppressing exculpatory evidence; coercing testimony; suborning perjury; presenting false and misleading evidence to the hearings.

E.    Did the District Court err in deciding that the Court should determine whether defendants gave Appellant sufficient materials to clear his name.

F.    Did the District Court err by determining that the NCAA defendants were not state actors even If the NCAA ignored an investigation and findings they knew had been corrupted by a state actor.

G.    Is there a question of fact whether the Infractions Appeal Committee would have further reduced findings and penalty on Appellant if they had been aware of the evidence which was undisputedly withheld from the IAC at the time.

## STATEMENT OF THE CASE

In August 1999, in an effort to remove Appellant from his job, an investigation began of alleged NCAA rules violations by Timothy M. Cohane, ("Cohane" or "Appellant"), the Head Basketball Coach at SUNY, concerning his presence in the gym during the off-season. *NDkt. 129 ¶8 A363.*[1] Between August, 1999 and October 12, 2001 SUNY, the MAC and the NCAA worked jointly to violate Cohane's due process rights. *Id. ¶¶ 1-194 A361-A397.* On December 3, 1999 Cohane was forced to resign by SUNY as part of an NCAA corrective action and after being told by SUNY counsel that the NCAA viewed his violations as "major". *Id. ¶¶ 17-18 A365.* After resignation Cohane attempted to defend himself against the allegations before the MAC Committee of Infractions,

---

[1] Appellant, a graduate of the Naval Academy, was awarded a Purple heart and two Bronze Stars for river boat duty in Vietnam, had 28 year successful coaching career, an extraordinary student-athlete graduation rate and had never had an allegation of even a secondary NCAA violation. *NDkt. 129 A363.*

("MACCOI") the NCAA Committee of Infractions ("NCAACOI") and the NCAA Infractions Appeal Committee ("NCAAIAC").  *Id.¶¶ 24, 25, 119-123, 144-148 A366-67, A383-84, A388-89*.   All three hearings published false reports which stigmatized and penalized Cohane. *Id. ¶¶2, 3, 25, 180 A361, A367, A395*.

On January 17, 2003 Appellant Cohane filed a law suit alleging the MAC's joint participation with SUNY deprived him of his liberty interest in his reputation without due process of law, in violation of 42 U.S.C. §1983 and tortious interference with Appellant's SUNY Buffalo employment and his subsequent resignation agreement. *GDkt. 50.*  On March 19, 2004 Appellant filed a second suit alleging the NCAA joint participation with SUNY deprived him of his liberty interest in his reputation without due process of law, in violation of 42 U.S.C. §1983. *NDkt. 1.*  On April 18, 2013 the District Court granted Appellant's renewed motion to consolidate the actions. *NDkt. 137.*  On March 27, 2014 the United States District Court for the Western District of New York granted Defendants' motions for summary Judgment and dismissed the complaints. *NDkt. 167 A442.*

Appellant Cohane appeals from the final order entered in the United States District Court for the Decision and Order granting Summary Judgment for defendants in the consolidated action *Cohane v. National Collegiate Athletic Association, et al.*

## SUMMARY OF THE ARGUMENT AND STANDARD OF REVIEW

This Appeal, while incorporating the voluminous evidence of improprieties in the factual history of this case, focuses in on the specific rationale relied on in the District Court's Decision and Order of March 27, 2014. Appellant Seeks the Court to review the order granting summary judgment <u>denovo</u> resolving all ambiguities and drawing all factual inferences in favor of Appellant. *Loeffler v. Staten Island University Hospital*, 582 F.3d 268, 274 (2d Cir. 2009).

### The District Court Granted The Defendants Summary Judgment Motion For The Following Reasons:

1. <u>NCAA</u> did not have joint action with SUNY and therefore not acting under color of State Law.

2. Even if state actor, <u>NCAA</u> did not impose a tangible burden to employment necessary in stigma-plus claim because "plus" was stayed.

3. Even if state actor and the plus burden satisfied, <u>NCAA</u> provided Plaintiff adequate process.

4. <u>MAC</u> cannot be liable because didn't impose the plus.

5. <u>SUNY</u> can't be liable because didn't impose the plus.

### Appellant's Argument On Appeal

1. The question of whether the NCAA jointly engaged with the State is a question of fact for the jury.

2. The question of whether the staying of the plus removed the tangible burden of future employment is a question of fact for the jury.

3. Whether the significant evidence presented indicates Plaintiff had adequate process is a question of fact for a jury.

**4.**    The plus would not have been imposed but for the actions of SUNY, the MAC and the NCAA, all liable under a stigma-plus claim.

**5.**    The District Court erred by incorrectly concluding Plaintiff had made the same arguments during the SUNY/MAC/NCAA process.

**6.**    The final SUNY/MAC/NCAA Appeal would have vacated the findings if Plaintiff had been afforded due process.

**ARGUMENT**

**I.    STATE ACTION**

**A.    After Deciding The MAC Engaged In Joint Action With SUNY, The District Court Erred By Not Finding That The NCAA Also Engaged In Joint action With SUNY**

The District Court held "[T]here is certainly evidence from which a jury could have concluded, for example, that Defendant Fournier knowingly and willingly participated with SUNY Buffalo officials in the procurement and selective presentation of evidence against Plaintiff.[2]  (See e.g. SUNY Docket 217 ¶13 (averment that Fournier told student athlete 'that other players had testified against [Plaintiff] and that if [the student's] testimony differed from theirs, [the student] was threatening [his] scholarship and eligibility due to NCAA Rule 10.1'); 255¶¶ 16-19 (Fournier removed certain prior student affidavits from the MAC 20 report and 'inadvertently failed to change the date')."  *NDkt. 167 Decision and Order page 30-31 A440-41.*  Moreover, the District Court accepted the Magistrates Report that noted "SUNY Buffalo was sufficiently involved in the MAC's

---

[2] *GDkt. 231-11 Expert Witness Report of Professor Ellen Yaroshefsky A331-44.*

investigation and reporting of the alleged NCAA violations so as to warrant a finding that the MAC engaged in joint action.  Accordingly, it is recommended that the MAC defendants' motion for summary judgment be denied with respect to their argument that they did not act under color of state law."  *NDkt. 139 Magistrate's Report, Recommendation and Order pgs, 98-100 A63-65*

Discovery has uncovered convincing evidence that would allow a jury to find that the NCAA enforcement Defendants not only had knowledge of the joint "procurement and selective presentation" by SUNY/MAC but knowingly and willingly embellished the tainted presentment and deliberately concealed material, exculpatory information that would have exonerated Cohane.  For example:

1.     The NCAA, like the MAC and SUNY, withheld the notes of William Maher ("Maher") which was SUNY's initial self-report.  SUNY Defendant Maher admitted he did provide the NCAA enforcement staff with the Maher self-report. *NDkt. 120-2. Deposition of Bill Maher April 23, 2011 p.113:11- p.114:15 A154.* The Maher self report contained material, exculpatory, mitigating information "that would have provided a basis to test the credibility of witnesses used in the NCAA hearing." *NDkt. 121-14A Swank Report p. 27 A278.*

2.     The NCAA was involved with the MAC and SUNY from the beginning. On Nov 11, 1999 MAC investigator, Defendant Rob Fournier ("Fournier") told Chris Strobel ("Strobel") of the NCAA enforcement staff, Fournier wants to tell University legal counsel that he talked with the NCAA and that there is "good chance a show cause order would be issued against coach by NCAA (cause U. wants to use Conf. report to fire him)." *NDkt 122-19 Strobel telephone notes* A221. Fournier also told SUNY Counsel Lou Rosenthal ("Rosenthal") the NCAA would like it if UB take disciplinary action against Coach Cohane and if they did it would be beneficial to University. GDkt. 242-7 *Deposition Lewis Elliott Rosenthal July 24, 2008 pages A202-04*; *NDkt. 123-3 Rosenthal telephone notes* A239-40.

6

**3.** The NCAA joined the MAC and SUNY in hiding corrupt behavior. NCAA Director of Enforcement for the Cohane case, Tom Hosty ("Hosty"), reluctantly admitted in deposition testimony, that the NCAA staff's case file had both divergent November 16, 1999 SUNY/MAC reports and therefore a trier of fact could find the NCAA participated in the fraudulent deception. *NDkt 119-15 Tom Hosty Deposition September 8, 2010 page 380 and pages 396 lines 9 thru page 399 line 16* A146-50**.**

**4.** Kevin Pearson ("Pearson"), the NCAA representative who interviewed the majority of the witnesses, concluded the case was secondary. He also concluded key witness Coach Eric Eisenberg ("Eisenberg"), was a "shady character" influencing players.[3] *NDkt. 120-8 Pearson deposition August 13, 2009 page 44 line16-line 20* A162; *page 49 line 17 through page 50 line 10 A163-64*; *NDkt.119-13, 14 Hosty Deposition April 23, 2009 page 310 line 25 through page 311 line 5* A143-44.

**5.** Defendant Maher has admitted that on March 3, 2000 when some students who had exhausted their eligibility were refusing to be interviewed by NCAA, they were threatened they may not graduate. *NDkt. 120-2 Deposition William J. Maher April 23, 2011 page 100 line 12 through page 101 line 2 A152-53*; *page 124 line 8-16 A155***;** *NDkt. 123-8 March 3,2000 email from Bill Maher to Dennis Black* stating student code of conduct can be used for "no meeting no degree." A244.

The evidence set forth in items 1 thru 5 above were first revealed during discovery and is proof which shows the NCAA, like its counterpart the MAC, was colluding and acting jointly with the State.

The NCAA Defendants have relied on *NCAA v. Tarkanian*, 488 U.S. 179, 199 (1988) for years as a shield from due process scrutiny. The Supreme Court specifically distinguished *Tarkanian* because there "is no suggestion of any

---

[3] Eisenberg admitted his affidavit used by SUNY, the MAC and the NCAA was false. NDkt. 118-12 Deposition Eric Eisenberg May 6, 2011 page 8 line 22 through page 9 line 3 A91-92; Id. at page 55 line 20 through page 56 line 25 A93-94; id. at page 58 line 4 through line 25 A94; Id. at page 59 lines 5 thru 14 A95.

7

impropriety respecting the agreement between the NCAA and UNLV." *Tarkanian*, 488 U.S. at FN 14 on 198, citing *Dennis v. Sparks*, 449 U.S. 24, 27 (1980). Indeed, the notion that the NCAA can never be a state actor has already been debunked by the Second Circuit which held in its prior Summary Order that "it was error for District Court to interpret *Tarkanian* as holding categorically that the NCAA can never be a state actor when it conducts an investigation of a State school." *NDkt. 126-3 Summary Order January 25, 2007 p.6 A62*.

**B.     The District Court Erred By Determining That There Was No Evidence From Which A Reasonable Jury Could Differ That The NCAA Defendants Acted In Concert With SUNY To Inflict An Unconstitutional Harm By Condoning The Activities Of The State As Well As Actively Participating In the Illicit Behavior.**

The process in the Cohane matter was so flawed that the NCAAIAC labeled it "troublesome." *NDkt. 125-18 Report of The National Collegiate Athletic Association Division I Infraction Appeals Committee October 12, 2001 Page 8 A228*. Specifically, The NCAAIAC was critical of an inconsistent investigation, and use of troublesome language and rationale regarding findings in the March 21, 2001 public infractions report regarding unethical conduct. *Id.* The "show cause" penalty was modified by the NCAAIAC without even knowing SUNY, the MAC and the NCAA enforcement staff had deliberately and collectively concealed the additional improprieties. *Id.* at pg 8 A229.

In addition to the evidence cited in numbers 1-5 on pages 6 and 7 herein, the following further confirm joint action between the NCAA and the state.

1.     NCAA enforcement representative, Defendant Stephanie Hannah ("Hannah") confirmed that SUNY counsel participated in her interviews of witnesses including student-athletes on numerous occasions. *GDkt. 233-9 Deposition Stephanie Hannah October 30, 2008 page 46 lines 8-11 A107*. As an example, SUNY Counsel Lewis Rosenthal ("Rosenthal") admitted that he had asked approximately 50 questions in the joint SUNY/NCAA interview of student-athlete Jon Kleidon. *NDkt. 120-19 Lewis Rosenthal Deposition July 8, 2008 page 328 line 8 through page 332 line 23 A194-98*.

**2.**     On January 5, 2001, in response to a request by Cohane for evidentiary information, Defendant MAC Commissioner Rick Chryst wrote Hosty of the NCAA, with copies to Arkeilpane and Maher of SUNY. Chryst, writing on behalf of the MAC and SUNY, falsely represented "at every stage of this matter over the last two years there has been full, fair and prompt disclosure of any and all evidentiary materials by those representing the Conference and the University at Buffalo." *NDkt.123-20 Second page January 5, 2001 letter from Chryst to Hosty A246*. All three parties — the SUNY, the MAC, and the NCAA — knew this statement by Chryst was false because they all had in their possession material, exculpatory information which they were obligated to present Cohane yet were deliberately withholding.

Based on all the evidence above, and drawing inferences in favor of the Appellant, a jury should decide whether the Defendants were acting under the color of state law.

### C.     Withholding Exculpatory Evidence Is Corrupt Behavior

David Swank, who was a former Chair of the NCAA Committee of Infractions for seven years and is Cohane's expert witness in this Case, has confirmed that NCAA "Bylaw 32.5.9 states that 'At any appearance before the

committee, the member and the enforcement staff **shall** have the obligation of providing full information concerning each allegation (i.e., information that **would corroborate or refute each allegation)' (Emphasis added).**" *NDkt. 121-14A Swank Report pg.25 A276*.

### Example of Suppressed Evidence That Refute the Allegations

Student witness, Sidney Brown ("Brown"), had been interviewed by Defendant Maher on July 27, 1999. In the July interview he truthfully absolved Cohane of any violations. *NDkt 118-6 Sidney Brown deposition April 29, 2011 page 19 lines 2-4) A78.*[4] Three months later, on October 22, 1999, Brown signed an affidavit procured by Defendants Fournier of the MAC and Maher of SUNY. The affidavit was directly inconsistent with his July 27, 1999 exculpatory statement. *NDkt, 121-17 Sidney Brown Affidavit June 20, 2011 Exhibit B Sidney Brown Affidavit October 22, 1999 ¶ 2 A313.* Brown has now admitted that his statement in his October, 1999 affidavit that "he was instructed by Coach Cohane to make sure that two prospects visiting campus on the same day played against each other" was a false statement. *Sidney Brown Affidavit June 20, 2011 ¶¶ 10-15 A307-08; NDkt 118-6 Sidney Brown deposition April 29, 2011 page 21 lines 7-15 A80.* Brown has also now admitted that his statement in his October, 1999

---

[4] The District Court is incorrect in stating that these arguments were already made. Cohane had only argued that Brown was inconsistent in his NCAA interview. If he had the full body of evidence the entire fix would have been exposed.

10

affidavit that "Cohane watched us practice/scrimmage" was false.  *Id. at page 21 lines 20 through page 23 line 1 A80-82.*  Brown indicated that when he signed his October, 1999 affidavit he did not recall being told he had a right to an attorney and that he felt pressure by the University to sign the statement.  *Id. at page 23 line 2 through line 7 A82*.[5]  SUNY, the MAC and the NCAA deliberately withheld the original exculpatory statement of Brown which was contained in the Maher self-report.  Instead they used Brown's false affidavit as evidence and mislead the MACCOI and the NCAACOI, thereby being part of the stigmatizing March 21, 2001 Infractions Report which mislead the NCAAIAC.  *NDkt 125-16 NCAA Response to Appeal of Timothy Cohane June 1, 2001 page 13 A223-24*.  Josephine Potuto ("Potuto"), who adjudicated the enforcement staff in the Cohane case, agreed that if the enforcement staff is relying on a witness who has made a prior inconsistent statement "I think the Committee would certainly want to know that" *NDkt. 120-9 Deposition Josephine Potuto February 18, 2011 page 129 line 21 page 130 line 9 A181-82*.

## II.    ADEQUACY OF PROCESS

A jury needs to answer one simple question to determine whether Cohane was denied due process.  If the concealed evidence (and the fact it was being

---

[5] Witnesses have testified to coercion. For example *See NDkt. 121-20 Affidavits of Damien Foster July 6, 2011* A314-18; *NDkt. 122-3 Affidavit Michael Sinclair June 29, 2011 A326-30*; NDkt. 122-1 Affidavit of Jon Kleidon June 20, 2011 A319-25; *NDkt. 121-16* Affidavit Myron Banks July 1, 2011 A356-60.

concealed) was available to the NCAAIAC, would the show cause have been vacated?

## A.    The District Court Erred By Use Of An Incorrect Fact In Making The Decision To Grant Summary Judgment For Defendants SUNY, MAC and NCAA.

The District Court made a critical statement that is flat out incorrect. "[A]lleged improprieties in both the MAC and the NCAACOI's investigation were raised by plaintiff before the NCAA Appeals Committee.  That Committee, which did not include any named individual Defendant, credited several of these arguments in reducing Plaintiff's penalty.  *NDkt. 167 United States District Court Decision and Order March 27, 2014, page 23 A433*.  "The fact that plaintiff ultimately did not obtain the full relief sought from the Appeals Committee does not mean that the afforded process was inadequate." *Id. at 24* A434.

In actuality, and therefore a crucial misconception made by the District Court while rendering the Summary Judgment decision, the alleged improprieties in this case were not even known by the Plaintiff until discovery in the instant case.  Worse, the improprieties alleged by Cohane in his Summary Judgment defense were deliberately suppressed not only from Cohane, but from the adjudicating hearings at the MACCOI, the NCAACOI and the NCAAIAC.  Whether the joint action was corrupt, thereby rendering the defendants state actors, is at the heart of the due process issue at bar.  Cohane therefore appeals that the Court must also

12

deny the NCAA motion for Summary Judgment on the issue of state action for two reasons:  One, whether the evidence presented renders the NCAA complicit with SUNY and the MAC is a question of fact; and two, the District Court wrongly believed Cohane had already made the same arguments he makes in the case today. "Resolution of the credibility issues raised by the conflicting statements, sometimes by the same witness, and other evidence in the record would be a task best left to a jury." *Id.* at pg *31 A441*.

> **B.    A Jury Could Decide That But For False Information Given To Adjudicators The Findings Would Have Been Overturned And The Penalties Would Have Vacated**

Hosty admitted "the University's self-report was essentially the MAC investigation and the company documentation that supported it, and that was provided to the enforcement staff by the university and the conference, and so it was – it was placed into our case file" *NDkt. 119-15 Hosty Deposition September 28, 2010 page 380 line 20-25 A145*.

At the Appeals hearing Hosty proffered false information to the IAC. NCAA Coordinator of Appeals, Jerry Parkinson ("Parkinson"), falsely told the IAC that the NCAA enforcement staff "had turned over everything they had, their entire case file, to Mr. Cohane". *NDkt. 120-5, 6, 7 Jerry R. Parkinson Deposition September 24, 2010 pages 134 line 10 through page 144 line 11 A166-76*. Depositions show that Hosty provided Parkinson the false information at the

hearing.  *Id.*  If this statement is not a blatant lie to the adjudicating Committee - which had the power to vacate the findings on Cohane –it at least presents a question of fact as to whether Cohane's hearings were fair.  Parkinson said later in his deposition testimony "I would be concerned if I were relying upon anyone's representations that were false or misleading."  *Id. at page 177 lines-17-20 A177.* The overall fairness of any proceeding is based upon truthful statements of all the participants."  *Id at page 178 lines 4-6 A178.*

One of the adjudicators at the NCAA Appeals Committee who heard the false statement that Cohane had received everything the "entire case file" was Kathy Noble ("Noble").  Noble has since opined that the denial of an individual at risk access to materials that refute an allegation by the Enforcement staff, if it affected the reliability of the information, "it sure could be" be a basis to overturn a finding on appeal.  *NDkt. 120-4 page 57 line 6-9 A160.*

Former IAC Chairman Mike Slive ("Slive") testified "I certainly would have expected and demanded information of that nature."  *NDkt 121-3 Mike Slive deposition August 27, 2010 page 41 line 13 through page 42 line 9 A213-14.*  For example, "I would like to know" that Kevin Pearson determined it was a secondary Case.  *Id. at page 145 line 10 through page 146 line 9 A215-16.*

Finally, evidentiary of a guilty mind, Hosty has admitted that he shredded his documents soon after the Appeals Hearing was over. *NDkt. 119-11 Tom Hosty Deposition April 21, 2009 pages 28-32 A140-41.*[6]

## C. Ex-parte Defamation Demonstrates There Is A Question Of Fact Whether The Infractions Appeal Committee Should Have Vacated The Show Cause Penalty On Cohane.

The NCAA Enforcement staff did not stop their improper activities with the close of the Appeals hearing. Evidence establishes that immediately after the hearing David Price ("Price") approached Chairman Slive (ex-parte) and falsely told him Cohane had presented information that was false. *NDkt. 125-20 September 11, 2006 Memorandum From Division I Committee of Infractions to Division I Infractions Appeal Committee page 3* A251. Hosty has admitted that during the hearing he told Price that Cohane was giving the IAC false information. *NDkt. 119-17 Tom Hosty deposition March 24, 2011 page 112 line 13-20 A109.* Price has not only admitted ex-parte communications but confirmed it was improper. *NDkt. 120-17 Price Deposition February 8, 2011 page 92 line 21through page 97 line 6 A187-91.* Appeals Committee member Noble has testified in her deposition the enforcement staff had no right to participate in the

---

[6] The destruction of evidence is in violation of the NCAA's record retention policy. "If the NCAA or Mr. Hosty, who is an attorney, were aware of the possibility of litigation arising out of the University/Tim Cohane case than there is an issue involving the destruction of these records under the common law doctrine known as spoilation of evidence." *NDkt. 121-14 pages 14-15 David Swank ("Swank") Report A265-66.* Also Fournier destroying an exculpatory affidavit. *NDkt. 118-15 Deposition Robert Fournier August 19, 2009 pg 17-18 A102-03.*

deliberations.  *NDkt. 120-4 page 26 line 25 through page 27 line 3 A157*.  Noble considered this communication after the hearing improper and testified it could compromise the integrity and fairness of the process provided Mr. Cohane.  *NDkt 120-4 page 30 line 14 through page 31 line 1 A158*.  Allan A. Ryan ("Ryan"), also on the Cohane Infractions Appeals Committee, stated "It was our responsibility as a committee to render a decision on that appeal.   There's no role for the enforcement staff to play in that process."  *NDkt. 121-1 Allan A. Ryan deposition October 27, 2010 page 20 line 7 through page 21 line 7 A206-07*.   They (enforcement staff) "had no role to play in the disposition of the appeal, and therefore, I would see no reason why they should have access to the decision making process."  *Id. at page 37 line 21 through page 38 line 1 A210-11*.

The NCAA Defendants' actions to influence the Appeals Committee continued right up to early October, 2001.  *NDkt. 121-4 Swank Report Question 2 page 3 through page 9 A254-260*.  David Swank ("Swank"), former COI Chair whose credentials and experience render him the foremost expert in NCAA Procedures, considers these ex-parte improprieties a "very serious violation of NCAA policies"  *Id at pg. 9 A260*.

Therefore, discovery has uncovered the following: admissions by deposed NCAA enforcement members to the egregious behavior; statements by the actual Infraction Appeals Committee members that the ex-parte communications were

improper and unfair; Plaintiff's expert in NCAA procedures conclusion the ex-parte communications were serious violations.  Cohane objects that there is no mention or concern by the District Court of the ex-parte activity.  Plaintiff can only conclude that the District Court ignores this evidence because it believed the ex-parte behavior was committed by the NCAA alone.  This reasoning is wrong for two reasons.  First, the NCAA was not alone.  The NCAA was using the tainted information provided to them by SUNY/MAC to conduct the ex-parte discussion.  Second, Cohane has alleged and provided evidence that the NCAA became a state actor when they first had joint corrupt behavior with SUNY and the MAC.  Therefore the NCAA "remained so through completion of the conspiracy's objectives" whether operating together with the state or independently.  *Dennis v. Sparks*, 449 U.S. 24, 27 (1980).

## III.   <u>STIGMA-PLUS</u>

### A.    **The District Court Erred By Determining That The Stay Of The Plus (Show Cause Sanction) Eliminated A Tangible Burden Upon Employment**

"To establish a 'stigma plus' claim, a plaintiff must show (1) the utterance of a statement sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false, and (2) a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights." *NDkt 167 United States District Court Decision and Order March 27, 2014, page*

17

20 *A430-31*, *citing Vega v. Lantz*, 596 F.3d at 81 (*internal quotation marks omitted*).  "*Although the 'plus' requirement is not clearly defined, it does not include 'the deleterious effects which flow directly from a sullied reputation'*".  *Id citing Valmonte v. Bane*, 18 F.3d 992, 1001 (2d Cir. 1994); *see*, *Davis v. N.N.Y. Sports Officials Council*, No. 7:09-CV- 0514 (GTS/GHL), 2010 WL 3909688, *8 (N.D.N.Y. Sept. 30, 2010) A430-31.

Whereas there is no dispute over the stigma prong being satisfied in the instant case, the District Court has erroneously decided the plus requirement is not satisfied. "[T]he show-cause was stayed for the duration of its existence.  As such, there was never any actual or potential burden on prospective employers that would amount to a tangible, state-imposed interference with Plaintiff's future employment."  *NDkt 167 United States District Court Decision and Order March 27, 2014, page* 20 A430 *citing Vega*, 596 F.3d at 81; Cf. *Valmonte*, 18 F.3d at 1001.  "Without this added 'plus,' the record of the show cause penalty's existence amounts to no more than stigmatizing statements which are by themselves insufficient to establish a constitutional deprivation."  *Id at page 20-21 A430-31*, *citing Siegert v. Gilley*, 500 U.S. at 233; *Patterson v. City of Utica*, 370 F.3d at 329-30.

However, previously in this case, the District Court had noted that in the Second Circuit "a plaintiff need not wait until he actually loses some job

opportunity". *GDkt. 63 United States District Court Western District of New York Decision and Order March 10, 2006 page 11 FN 3A53*. "[T]he presence of the charges in his personnel file coupled with a likelihood of harmful disclosure already place him 'between the devil and the deep blue sea.'" *Id A53*, *quoting Brandt v. Bd. Of Co-op Educ. Services, Third Supervisory Dist. Suffolk County, N.Y.*, 820 F.2d 41, 45 (2d Cir. 1987). Cohane is faced with the same likelihood because any prospective employer can easily access Cohane's record and in this case his "marred personnel record place a tangible burden on his employment prospects." *GDkt. 63 United States District Court Western District of New York Decision and Order March 10, 2006 page 12 A54*. Cohane's marred personnel record includes not only the "show cause" but also inclusion in the "pink file" and the publication of penalties associated with his termination. Plaintiff objects and appeals that the District Court contradicts their own prior holding by now stating the plus never existed simply because the "show cause" was stayed.

## B.    "Show Cause" Satisfies "Plus"

Whether the "show cause" was in effect for one second or over fifteen months, Cohane suffered a burden that deprives him of his liberty interest to seek employment as an NCAA college basketball head coach. *See GDkt. 230-20 News Release March 21, 2001 Show Cause Penalty Imposed A 230*. Potuto, who has testified before Congress as an NCAA enforcement expert, also testified in the

instant case that a show cause penalty is detrimental to a coach's career. *NDkt. 120-9 Deposition Josephine Potuto page 75 lines 12-15 A180*. Indeed, Cohane has applied for over one hundred college head coaching positions since October 12, 2001 without success. *NDkt 121-19 Declaration of Timothy Cohane July 6, 2011 ¶ 7 A350*. The District Court concluded that a show cause is a sufficient burden on future employment to satisfy the "plus" requirement in a stigma-plus claim. NDkt. 167 *United States District Court Decision and Order, March 27, 2014, page 19 A429*. If likely to be disclosed to future employers, courts have concluded that a stigmatizing statement placed in an employee's personnel file is enough to conclude that the "plus" requirement has been satisfied. *Peres v. Oceanside Union Free School Dist.*, 426 F. Supp. 2d 15, 27.

It is an indisputable fact that the IAC had the power to vacate the show cause. For, example Cohane has presented evidence of the show cause burden on a coach being vacated. *NDkt. 126-1 New Mexico State Appeals report December 20, 1996 page 15 (penalties) A226*. It is impossible to stay something that never existed. If the plus had been vacated Cohane could answer truthfully to prospective employers that he has no "show cause" on his record and there would be no trace of the show cause in his personnel file.

As shown below, the deposition testimony of Chairman of the IAC, Mike Slive, establishes that the show cause was only "reduced" not vacated.  In order for the show cause to be reduced it had to have existed.

| | |
|---|---|
| Question | "Your committee reduced the show-cause against Mr. Cohane for the time served, right Mike?" |
| Answer | "Yes, sir, we did." *NDkt.121-6 Deposition Slive, August 27, 2009 pg. 309:3-5 A218.* |

Furthermore, the Report of The National Collegiate Athletic Association Division I Infractions Appeals Committee October 12, 2001 unequivocally stated the "show cause" existed.  "The Committee believes the show cause order of three years running from the date of the former head coach's termination from employment at the institution (December 2, 2000) is excessive."  *NDkt 125-18 page 10 A229.*

The District Court itself contradicted their own argument that the stigma-plus never existed by stating The IAC "credited several of these arguments in reducing Plaintiff's penalty."  *United States District Court Decision and Order, March 27, 2014, page 23-24 A433-34.*

The District Court's adoption of Defendants' argument that, technically, the "show cause" order never existed is flawed.  The "show cause" order was and still is real.  What NCAA Defendants hinge their final lasso around, in an attempt to maintain ultimate, unregulatable power and control over an American industry, is

the fact that their own final appeals committee called NCAA Defendants out on all their unethical, corrupt, and un-American acts, and ended the very real and existing "show cause" order. The NCAA Defendants, as state actors, imposed a sanction that almost certainly would bar Cohane from ever becoming a head coach again. "In my experience" when an athletic administrators are considering a candidate for a coaching job, it would be customary for the athletic administration to review the infractions' report of a candidate. *Kathy Noble deposition February 10, 2011 page 37 line 6-11 A159.*

Just because a penalty's proscription formalities (a school actual showing cause) are not fully executed does not mean they did not present a tangible burden for employment. When Cohane and other candidates apply for a head coaching position, Cohane is still burdened by his "show cause" record. The same way an individual who has been in jail is freed based on DNA proof is burdened with the felony on his record unless the felony is vacated.

To hold that a stay of the "show cause" negates the plus could invite such an organization as the NCAA to fabricate evidence, institute pre-determined investigations and cover ups but if the Coach protests, protect yourself by instituting a stay. Fire the coach, defame him, institute the show cause- then impose a stay. Such a policy runs contrary to the interest of public policy by insulating the wrongdoer from the scrutiny constitutional protection.

22

### C.     "Pink File" And The Marred Personnel Record Satisfies "Plus"

Even if Cohane had never been penalized with the show cause label, his record was still marred by the defendants and the plus exists.  The inclusion of Cohane's name and held violations (including the "show cause") in the NCAA permanent personnel records known as the "pink file" fulfills the "plus" requirement as well.  The "pink file" lasts "in perpetuity".  *Deposition Shepard Cooper May 4, 2009 page 11 line 23 through page 24 line 8 A84-85.*

In *Valmonte* the court held that because a plaintiff had been placed on the child abuse registry and that a statute required prospective employers to consult the registry before hiring Valmonte, he had met the requirements of "plus" under his due process claim.  *Valmonte v. Bane*, 18 F.3d 992, 1002 (2d Cir. 1994).  Cohane's case is analogous because his inclusion in the "pink file" is a readily available document that schools interested in hiring him would use to see if he had violated any rules and if the show cause had ever been issued against him.

The only question in determining whether the "pink file" constitutes a plus is whether inclusion would hinder future employment beyond just the "deleterious effect of a sullied reputation."  *Trudeau v. New York State Consumer Protection Bd.*, 2006 WL 1229018, *13 (N.D.N.Y.) May 4, 2006.  Surely an educational institution looking to hire a head coach of a collegiate basketball program would exercise due diligence by checking the history of candidates.  Such due diligence

would certainly reveal the stigmatizing March 21, 2001 Report, still on the internet today, as well as inclusion on the NCAA registry of major offenders - the ─ "pink file".

The standard is simply the likelihood of the due diligence – not any requirement to conduct due diligence.  In *O'Connor v. Pierson,* the court found that the "plus" was satisfied because of the placement of a letter, indicating wrongdoing by a teacher, in the employee's personnel file, likely "to be disclosed to future employees."  *O'Connor v. Pierson*, 426 F.3d 187 (2005).  The "pink file" is highly likely to be disclosed to future employers.

The notion that Cohane's inclusion in his SUNY and NCAA personnel file has not, and is not a burden to him becoming a head Coach again has no grounds in reality.  Kathy Noble, veteran College athletic administrator, testified that if a candidate for a coaching position with an unethical conduct finding against him "at the institutions that I've worked at, they wouldn't be hired".  *NDkt. 120-4 deposition February 10, 2011 pages 35 line 13 through page 36 line 3 A159.*  And Mike Slive, now the Commissioner of the Southeast Conference, agreed that a finding of unethical conduct is a stain on a coach's career.  *NDkt. 121-6 Michael Slive deposition August 27, 2010 page 264 lines 2-5 A217.*  To think that a school in the NCAA would bypass using research tools from their own organization when hiring potential coaching candidates would eliminate any need for the "pink file"

24

to exist in the first place.  Indeed, individuals conducting a search for a head coach could be accused of negligence for not thoroughly investigating applicant backgrounds.  The mere existence of the "pink file" for the use of NCAA schools nullifies the NCAA's argument that they have not impeded Cohane's liberty interest because it effectively prevents his ability to obtain future employment as a head basketball coach.  *See*, *Paul v. Davis*, 424 U.S. 693, 704 (1976).

### D.    Loss of Government Employment Satisfies "Plus"

In addition to the plus imposed by the "show cause" and the "pink fist", "Loss of one's reputation can invoke the protections of the Due Process Clause if that loss is coupled with the deprivation of a more tangible interest, such as government employment."  *Patterson*, 370 F.3d 322, 330 (2d Cir. 2004).

The Second Circuit has never held that a liberty interest is implicated where a state official makes a stigmatizing statement about an individual <u>outside</u> of the context of the termination of that individual from public employment and the stigmatizing statement burdens the individual's ability to secure future employment.  However, here the stigmatizing statements were made at the joint press conference and the release of the March 21, 2001 Infractions Report that addressed and related to the current state of affairs <u>inside</u> the Coach's termination.

Therefore the stigmatizing statements can be considered part of the termination, sufficient to constitute a liberty interest.  *Walentas v. Lipper*, 862 F.2d

414, 422 (2d Cir. 1988); *see also Seigert v. Gilley*, 500 U.S. 226, 233-234 (1991); *Skiptunas v Mills, et al.*, Case No. 98-CV-1813, 2000 WL 14483, at *5 (N.D.N.Y., Jan. 5, 2000). The March 21, 2001 State University of New York Public Infractions Report ("NCAA/SUNY Report") was released to the press. *NDkt. 230-20 NCAA News Release A234*. The NCAA/SUNY Report noted the "self imposed corrective action" of the State University of suspension of Cohane followed by an "agreement with the coach that they would accept his resignation on December 3, 1999." *Id. at pg. 17 A235*. The NCAA March 21, Report not only "agreed with and approved" the self corrective action but imposed the additional show cause penalty. *Id. at page 18 A236*. Clearly then, the combined penalties are part of Cohane's employment termination even though recorded sixteen months after the forced resignation.

## IV.   SUNY/MAC LIABILITY

### A.   The District Court Erred By Deciding SUNY And The MAC Can Not Be Held Liable For Imposition Of The "Plus"

Cohane appeals the District Court's current opinion that "SUNY nor MAC could be held liable for imposing show cause." *See*, *Vega*, 596 F.3d at 81." *NDkt. 167 Decision and Order page 21 A431*. "Moreover the NCAA Committee of Appeals ultimately did not adopt the MAC investigation, or even that of the NCAA COI." *Id. at 22 A432*.

The District Court in this case has previously articulated a different conclusion. The District Court previously held SUNY could not avoid liability by arguing it was the MAC and the NCAA and not SUNY that imposed sanctions on Cohane. *GDkt. 63 United States District Court Western District of New York Decision and Order March 10, 2006 page 12 A54*. The District Court stated "Although the 'stigma' and the 'plus' typically will originate with the same state actor, 'perfect parity in the origin of both the 'stigma' and the 'plus' is not required' as long as the 'stigma' and 'plus' are sufficiently proximate." *Anemone*, 419 F. Supp. 2d 602, 2006 WL 164910 at*9 (quoting *Velez v. Levy*, 401 F.3d 75, 89 (2d Cir. 2005)). Proximity is satisfied where: '(1) the stigma and plus would, to a reasonable observer, appear connected – for example, due to their order of occurrence, or their origin – and (2) the actor imposing the plus adopted (explicitly or implicitly) those statements in doing so." *Velez*, 401 F.3d at 89 (internal citations omitted)." *Anemone v. Metropolitan Transp. Auth*., 419 F. Supp. 2d 602, 2006 WL 164910 (S.D.N.Y. January 24, 2006). *Id.*

Clearly, and in concurrence with the District Court's rationale above, the plus originated with the SUNY/MAC tainted process and was adopted and embellished by the NCAA. The joint state actors had achieved their planned objective - to remove Cohane from his employment at Buffalo followed by the

27

issuance of career ending sanctions.  And the stigma and the plus would appear connected to any reasonable observer.

Defendant Arkeilpane has admitted in his deposition that but for the SUNY-MAC findings "the case would have gone away, and Mr. Cohane likely would have continued coaching" *NDkt.118-1 page 129 lines 8-10 Robert J. Arkeilpane deposition February 21, 2011 A68*.  Instead, and "as a consequence" of the MACCOI findings against Cohane, the case was forwarded to the NCAA.  *NDkt 123-6 January 18, 2000 letter with MACCOI findings page 2 A242*.

Cohane therefore objects and appeals the District Court decision that there is no question of fact that the NCAA could not have imposed the show cause without the assistance of the State.  The "consequence" for Cohane would have been completely different but for the assistance of the State.  Therefore, the evidence shows the NCAA, the MAC and SUNY were on the same mission.

## V.    DOES BRADY APPLY

The overabundance of evidence herein indicates that SUNY, MAC and NCAA defendants jointly, collectively, and intentionally withheld (and destroyed) exculpatory evidence from Plaintiff Cohane.  It is axiomatic in a criminal procedure that the suppression by the prosecution of evidence favorable to an accused violates due process where the evidence is material to guilt or punishment, irrespective of the good faith or bad faith of the prosecution.  Since the seminal

decision of *Brady v. Maryland*, 273 U.S. 83, 87 (1963) courts have been increasingly receptive in applying the duties enumerated in Brady to civil cases, administrative cases, and denaturalization cases. *Demjanjuk v. Petrovsky*, 10 F.3d 338, 354 (6th Cir 1993), *cert. denied*, 513 U.S. 914 (1994), *(concluding that Brady applied in denaturalization and extradition cases based on proof of alleged criminal activities of the party preceded against)*; *EEOC v. Los Alamos Constructors*, 382 F. Supp. 1373, 1383 n. 5 (D.N.M., 1974) ("*Brady orders that exculpatory information must be furnished a defendant in a criminal case. A defendant in a civil case bought by the Government should be afforded no less due process of law.*"); *United States v. Edwards*, 777 F. Supp. 2d 985, 993 (E.D.N.C., 2011) (*holding that Brady is applicable to cases proceeding under 18 U.S.C. §4248 even though they are civil cases*); *Bass v. Philadelphia*, 4 Pa. D. & C. 3d 39, 1978 WL 248, 1, 2 (Pa. Comm. Pl., 1978) (*holding that Brady is applicable to civil cases involving a charge of governmental abuse of power, because the government has vast investigatory machinery in contrast to an individual's presumably more limited resources*).

Guided by these principles, the Southern District Court of New York, when confronted with this precise issue, noted that Brady duties were presumably applicable in civil administrative cases. *Sperry & Hutchinson Co. v. FTC*, 256 F. Supp. 136, 142 (S.D.N.Y. 1966). There, the civil court explicitly stated

29

"[p]resumably the essentials of due process at the administrative level require [Brady] disclosures by the agency where consistent with the public interest." *Id.* The court further explained, "the ultimate objective is not that the Government shall win a case, but that justice be done." *Id.* Ultimately, the court in *Sperry* rejected the notion that *Brady* applied in that particular case, because the plaintiff there had access to the material through discovery. *Id.*

In the current case, defendants had a Brady duty to disclose exculpatory evidence relating to allegations against Cohane. Here, unlike the plaintiff in *Sperry*, Cohane was not able to receive Brady material through discovery because the defendants, not only disregarded their policies and obligations to furnish exculpatory evidence but also willfully destroyed some of the evidence. It follows that defendants' suppression and/or destruction of the evidence amounts to Brady violations that are against public policy and violate the principles of due process.

## VI.   FACTUAL BASIS BY DISTRICT COURT IS FLAWED

Plaintiff appeals the District Court's decision not to consider Cohane's "recitation of 'distorted facts'. *NDkt. 167 March 27, 2014, Decision and Order page 16 footnote 1 A426.* Plaintiff painstakingly took thirty-three pages to specifically prove that the facts relied upon by the Magistrate were wrong or misleading. *NDkt. 139 Plaintiff's ObjectionsTo Magistrate Judge's Report, Recommendation and Order pages 30-63.* Moreover, it indicates that Plaintiff was

not properly given the inferences required by the standards of review for summary judgment.

A party objecting to magistrate judge's report and recommendations may not relitigate entire contents of hearing by submitting papers to district court which are nothing more than rehashing of earlier arguments." *Camarado v. General Motors Hourly-Rate Employees Pension Plan*, 806 F. Supp. 380 1992 WL 340849 *citing* U.S. Dist. Ct. Rules W.D.N.Y. Local Rule 30(a)(3). However, here Cohane was not re-litigating. He specifically pointed out numerous instances where the facts presented were wrong, misleading or incomplete. Cohane appeals that the District Court erred by not even considering these specific objections.

## Example

The following is an example of how the presentation to the Court in the Magistrate's Judge's Report, Recommendation and Order was distorted and flawed.

On pages 15 and 16 the Report relays the incident regarding Eric Eisenberg's claim that he was bribed by Cohane. Plaintiff objects that such an unsubstantiated claim is even listed without explaining related facts.

- On October 7, 1999 Cohane was informed of improper behavior of Assistant Coach Eric ― Rock Eisenberg, which occurred in December of 1998 during a team trip to Hawaii. *GDkt. # 219 Daniel Valenti Aff. ¶ 13.*

31

- Cohane informed Defendant Eisenberg that, as a result of Eisenberg's improper behavior in Hawaii, Eisenberg could no longer be an assistant coach. *GDkt. #220 Cohane Decl. ¶ 33.*

- On October 8, 2011, Defendant Eisenberg met with Defendants Arkeilpane and Maher and was assured that he would not be removed by Cohane. *GDkt. #222 Ex. 18 Maher notes from October 11-October 13, 1999.*

- On October 11, 1999, Defendant Fournier told Defendant Maher to secure an affidavit from Defendant Eisenberg that claimed Cohane attempted to bribe Eisenberg. *Id.*

- On October 14, 1999, Cohane requested that Defendant Greiner reassign Defendant Eisenberg for Eisenberg's involvement in the—Hawaii incident. *NDkt. # 16 Greiner deposition June 11, 2007 (p. 222, ln. 8 – p. 224, ln. 16*); *Maher notes from October 15, 1999  Dkt. # 222 Ex. 19.*

- No investigations or proceedings were ever initiated by the University in response to the reported — Hawaii incident *NDkt. #16 Greiner deposition June 12, 2007 (p. 8, ln. 7 – p. 90, ln. 15).*

- No one from SUNY Buffalo contacted Daniel Valenti, a SUNY Buffalo student at the time, about the —Hawaii incident. *GDkt. # 219 Daniel Valenti Aff. ¶ 13*

- Facts show that this claim and affidavit of Eisenberg are false. Defendant Eisenberg never observed Cohane violate NCAA rules. *NDkt. #118 Ex. 10. Eisenberg deposition May 6, 2011 (p. 58, ln. 4 – p. 59, ln. 16).*

The above example is only one of countless facts that were inaccurately presented to the District Court in the Magistrate's Report.  Cohane therefore appeals the District Court's Decision and Order that these 33 pages present no legal argument.  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue

for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2510 (1986).

## VII.   <u>TORTIOUS INTERFERENCE</u>

Court erred in dismissing the tortious interference claim against the MAC stating "Any alleged interference with the employment contract is barred by the statute of limitations, inasmuch as that contract terminated with plaintiff's resignation December 3, 1999, and the action against the MAC defendants was not commenced until January 17, 2003." *NDkt. 167 A438*.  Further, the District Court held "Plaintiff has not alleged any interference with his rights under the resignation agreement." *Id. at A439*.

Appellant argues that the resignation agreement which afforded an opportunity to respond to the allegations, were completely breached by the conduct of the MAC described herein.  The effects of this conduct permeated right up to the adjudication on March 21, 2001 and continued until the final administrative decision.  These dates satisfy March statute of limitations calculations.

## VII.   <u>CONCLUSION</u>

Tim Cohane was a College Basketball Coach who was first an educator.  His student-athletes graduated at one of the highest rates in college basketball history.  His former players went on to outstanding careers in education, business, law, medicine and government.   He had an unblemished record in NCAA rule

## <u>CERTIFICATE OF COMPLIANCE WITH FRAP 32(a)</u>

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 8, 270 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14 point font.

## CERTIFICATE OF COMPLIANCE WITH FRAP 32(a)

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 8, 270 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14 point font.

SPECIAL APPENDIX

### Table of Contents

**Page**

Decision and Order of the Honorable William M. Skretny,
dated March 23, 2014, Appealed From ......................................... SPA1

Notice of Appeal, dated April 25, 2014 ............................................... SPA33

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

TIMOTHY M. COHANE,

                                    Plaintiffs,

        v.                                                          **DECISION AND ORDER**
                                                                    04-CV-181S(Sr)
NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION, TOM HOSTY, STEPHANIE
HANNAH and JACK FRIEDENTHAL, WILLIAM
M. GREINER, President of the State University
of New York at Buffalo, DENNIS BLACK, Vice
President for Student Affairs, ROBERT
ARKEILPANE, Athletic Director, WILLIAM
MAHER, Compliance Director, ERIC
EISENBERG, MID AMERICAN CONFERENCE,
by its Commissioner, Richard Chryst, and
ROBERT FOURNIER, Esq.,

                                    Defendants.

## I. INTRODUCTION

In this consolidated action, Plaintiff, a former basketball coach at the State University of New York at Buffalo, seeks relief pursuant to 42 U.S.C. § 1983 for Defendants' alleged violations of his procedural and substantive due process rights. Plaintiff also asserts a claim under New York state law for tortious interference with contract. Presently before this Court are the objections of Plaintiff and Defendants Mid-American Conference and Robert Fournier (the "MAC Defendants") to the Honorable H. Kenneth Schroeder, Jr.'s August 8, 2013 Report, Recommendation and Order recommending that Defendants' summary judgment motions be granted and the complaints be dismissed.

1

## II. BACKGROUND

Plaintiff commenced the initial action against the MAC Defendants and officials of the State University of New York at Buffalo on January 17, 2003 in the Eastern District of New York. (Docket No. 55-1 in 1:04-cv-943 ("SUNY Docket").) The matter was transferred to this Court in November 2004. Plaintiff filed a second action against the National Collegiate Athletic Association ("NCAA") and several NCAA employees in this Court on March 19, 2004. (Docket No. 1 in 1:04-cv-181 ("NCAA Docket").) In both actions, Plaintiff similarly accuses the MAC and NCAA Defendants of acting under the color of state law by jointly engaging with SUNY officials to violate Plaintiff's substantive and procedural due process rights as guaranteed by the Fourteenth Amendment. The MAC Defendants are further alleged to have tortiously interfered with Plaintiff's SUNY Buffalo employment contract and his subsequent resignation agreement.

These actions stem from investigations into Plaintiff's alleged violations of MAC and/or NCAA rules governing off-season practice, observation of practices or scrimmages with prospective student athletes, and scouting. MAC is a NCAA Division I-A athletic conference. (SUNY Docket No. 198 ¶¶ 9, 11.) SUNY Buffalo is a member of both MAC and the NCAA. (Id. ¶ 12; SUNY Docket No. 199-1 ¶¶ 8, 14.) MAC's Committee on Infractions ("MAC COI") is responsible for determining whether specific violations of NCAA and/or MAC rules have occurred with respect to both member institutions and individuals. (SUNY Docket No. 199-1 at 38.) The MAC COI does not have any direct authority to assess penalties against an individual staff member of a member institution; however, the committee does recommend appropriate disciplinary action. (SUNY Docket No. 198 ¶ 20.)

In 1999, SUNY Buffalo 'self-reported' alleged violations of NCAA rules by its men's

2

basketball program to MAC. (SUNY Docket Nos. 198 ¶ 28; 210 ¶ 28.)  As a result, Defendant Robert Fournier, MAC's Senior Associate Commissioner of Compliance at the time, conducted an on-campus investigation of the allegations that fall. (SUNY Docket Nos. 198 ¶¶ 25, 29-30; 210 ¶¶ 25, 29.)  Defendants argue that Fournier conducted the investigation with mere administrative support provided by SUNY Buffalo. (SUNY Docket Nos. 198 ¶ 30; 255 ¶¶ 6-7.) In contrast, Plaintiff argues that Fournier conducted a joint investigation with SUNY, complete with SUNY officials participating in interviews and procuring inculpatory affidavits, with the goal of removing Plaintiff from his position as head coach. (SUNY Docket Nos. 210 ¶ 30; 261 at 87.)

On November 16, 1999, Defendant Fournier presented to SUNY Buffalo a report detailing 18 allegations of misconduct against the men's basketball program (the "MAC 18" report). (SUNY Docket No. 229-11 at 13-23.)  Each allegation was followed by a description of the supporting evidence.  SUNY Buffalo was afforded the opportunity to consider the allegations and either concur, offer modifications, or refute the allegations. (Id. at 13.)

On November 29, 1999, SUNY Buffalo informed Plaintiff that it was considering suspending him in connection with the alleged improprieties and conducted a hearing at which Plaintiff was represented by counsel and presented with a copy of the MAC 18 report. (SUNY Docket No. 196-5 at 2-3, 11-12.)    During that hearing, Plaintiff was questioned regarding an allegation that was not included in the MAC 18 report, specifically that Mitch Gillam, a prospective assistant coach whom Plaintiff was precluded from hiring, was seen improperly scouting at a basketball game at another school. (Id. at 107-116.) Plaintiff denied that Gillam was acting on his behalf or ever provided him with scouting

3

information. (Id. at 115-116.)

SUNY Buffalo accepted the findings in the MAC 18 report on December 1, 1999 and suspended Plaintiff that same day. (SUNY Docket Nos. 189-1 ¶ 91; 211 ¶ 91; 234-4 at 2; 261 at 58.) On December 3, 1999, Plaintiff and SUNY Buffalo entered into an agreement by which Plaintiff would resign and SUNY would pay him the remainder of his contract, the sum of $265,000. (SUNY Docket No. 194 at 5-7.) The parties acknowledged in the agreement that Plaintiff retained the opportunity to provide a written response to MAC regarding the allegations in the MAC 18 report. (SUNY Docket No. 194 at 5-6.) A mutual general release was executed at that time in which Plaintiff waived all claims against SUNY Buffalo "existing as of or prior to the execution of this Memorandum of Understanding." (Id. at 8.) Plaintiff submitted a 30-page response to the MAC 18 report in a letter dated December 22, 1999. (SUNY Docket No. 196-6.) Plaintiff argued therein that much of the testimony relied upon came from student witnesses recruited by another coach, and he therefore offered affidavits from additional students in support of his objections. (See e.g. id. at 16, 18, )

In a December 22, 1999 letter, Fournier informed SUNY Buffalo of MAC's recommended corrective measures in light of the found infractions. (Docket No. 190 at 71-73.) Fournier identified SUNY's decision to accept Plaintiff's resignation and the additional staffing changes made by SUNY as important corrective measures, and further recommended 12 additional corrective measures, including the placement of the men's basketball program on probation. (Id.) SUNY Buffalo accepted these recommendations in their entirety. (SUNY Docket No. 238 at 12.)

SUNY Buffalo self-reported an additional allegation on January 3, 2000, specifically

4

that "an individual closely associated with [the] men's basketball program[, Mitch Gillam,] engaged in scouting activities with two future opponents." (Docket No. 241 at 41-42.) Sometime between receipt of the self-report and January 16, 2000, Fournier revised the MAC 18 report to including the scouting allegation and one other allegation not relevant to the current action (the "MAC 20" report). (SUNY Docket No. 227 at 15-25.) The MAC 20 nonetheless remained dated November 16, 1999. (Id.) Fournier avers that he "inadvertently failed to change the date on the report." (Docket No. 255 ¶ 17.) He also added three additional student athlete affidavits submitted by SUNY Buffalo "and removed these student-athletes' prior affidavits so that the [MAC] Committee had the most current statements from these student athletes and what I believed to be the statements that best reflected their intended true positions and recollections since they were the most recent statements." (Docket No. 255 ¶ 18.) Plaintiff asserts that he never saw the MAC 20 report until discovery in 2007. (SUNY Docket No. 220 ¶ 42.)

The MAC Committee on Infractions ("MAC COI") held a hearing on January 16, 2000 at which Plaintiff appeared. (SUNY Docket Nos. 220 ¶ 46; 255 ¶ 24.) Fournier asserts that he presented the additional allegation of scouting, and that Plaintiff was present when Fournier played a video in support of that allegation and had an opportunity to respond. (SUNY Docket No. 255 ¶ 24.) Plaintiff similarly testified at his deposition that he was present for Fournier's presentation, he himself also made a presentation, and then he was asked to leave. (SUNY Docket No. 196-3 at 43-45.)

The MAC COI, by letter dated January 18, 2000, adopted the findings in the MAC 20 and the recommended correction measures. (SUNY Docket No. 238 at 13-14.) The Committee also voted to make three additional recommendations, including "issuing a

5

formal Letter of Reprimand to [Plaintiff] for his acknowledgment of wrongdoing before the Committee in some of the infractions and his possible involvement in others as noted in the report." (Id.) The case was then forwarded to the NCAA enforcement staff for review and "final adjudication." (Id. at 14.)

A preliminary inquiry by the NCAA then commenced. NCAA Enforcement staff Kevin Pearson conducted interviews of student athletes and administrators in Buffalo, including Plaintiff, in March and May 2000. (SUNY Docket Nos. 196-4 at 9; 196-24 at 3-4.) The NCAA determined that Fournier and MAC should not be a part of the NCAA interviews, in part "to test the credibility of the witnesses" previously interviewed by Fournier (SUNY Docket No. 261 at 77) in light of "statements of alleged intimidation." (NCAA Docket No. 123-8 at 4.) As a result of his investigation, Pearson believed the matter was a "secondary" case that should not proceed to a letter of official inquiry, and he informed the NCAA Enforcement Director, Defendant Tom Hosty, of his concern. (SUNY Docket Nos. 235-9 at 2; 235-10 at 2-3; NCAA Docket No. 119-16 at 47; see SUNY Docket No. 196-22 at 6 (discussing distinction between secondary and major infractions).) Pearson believed that "there were clearly issues with credibility with some witnesses, and [he] had a hard time because of that in making it a major case." (SUNY Docket No. 235-10 at 2-3.)

The investigation nonetheless continued, and upon Pearson's departure from the NCAA, Hosty assigned Defendant Stephanie Hannah to complete the interview process. (NCAA Docket No. 119-16 at 46.) By letters dated November 20, 2000, the NCAA informed Plaintiff and SUNY Buffalo that an official inquiry was warranted. (SUNY Docket Nos. 196-10; 196-11; 236-13.) The letter to Plaintiff informed him of his ability to "participate in consideration of these allegations" and the opportunity to submit a written

6

response to the NCAA Committee on Infractions ("NCAA COI"). (SUNY Docket No. 196-11.)

Following notification of the official inquiry, the NCAA staff created a custodial file containing information collected during the investigation. (SUNY Docket No. 196-22 at 5.) The file was initially maintained by a custodian in New York City and then transferred to one in Pittsfield, Massachusetts, both locations requested by Plaintiff. (SUNY Docket Nos. 258-3 at 2-3; 258-4 at 3-4; 258-5 at 5-6.) In December 2000, SUNY Buffalo provided the NCAA with copies of taped interviews conducted during the MAC investigation that were requested by Plaintiff, but these tapes were not received by the custodian until January 2, 2001, the day after Plaintiff's response to the NCAA inquiry was due. (SUNY Docket Nos. 192 at 91; 196-22 at 17.) Hosty testified that he informed Plaintiff's counsel that a request for additional time could be made. (SUNY Docket No. 196-22 at 17.)

The NCAA enforcement staff met with Plaintiff and his counsel on January 8, 2001. (SUNY Docket No. 196-22 at 10, 18.) This was originally scheduled to be a prehearing conference following receipt of Plaintiff's written response. (Id. at 18.) Although the response was not filed on the January 2, 2001 date, the meeting nonetheless went forward to allow Plaintiff the opportunity to walk the enforcement staff "through their case, their defense, because [Hosty] believe[d] that they were trying to persuade us to drop the allegations." (Id. at 18-19; NCAA Docket No. 119-20 at 33-35.)

Plaintiff filed a written response to the NCAA official inquiry on January 11, 2001, wherein he detailed the use of intimidation in the interview process and the changing testimony from witnesses. (SUNY Docket No. 196-8.) This response also addresses the MAC interview tapes and the Mitch Gillam scouting allegation. (Id. at 17-18, 62-67.) A

7

formal prehearing conference was held on January 17, 2001. (SUNY Docket No. 196-22 at 19.)

The NCAA COI conducted a hearing on February 9, 2001, at which Plaintiff appeared with counsel. (SUNY Docket Nos. 196-12, 196-13; NCAA Docket No. 124-5 at 6.) Defendant Jack Friedenthal was the presiding chairman. (SUNY Docket Nos. 196-12 at 3.) Plaintiff challenged the propriety of the MAC investigation at that time, arguing that "[u]nlike during the NCAA process, where the enforcement staff has provided materials to the custodian, the MAC never provided affidavits, interview tapes, nothing that would in any way have enabled [Plaintiff] to properly address the individual allegations made by witnesses against him." (SUNY Docket No. 196-12 at 9, 11.) The Committee questioned the enforcement staff on, among other things, the fact that many of the affidavits supporting the allegations had handwritten notations taking "a little bit of the sting out" of the prepared statement. (SUNY Docket No. 196-12 at 21.) Because this raised questions whether "people [were] being driven to some position that may not be theirs," the staff was further questioned on the procurement of these affidavits. (Id. at 21-28.) The allegations of intimidation and the questionable veracity of the witnesses were also addressed at length. (See e.g. SUNY Docket Nos. 196-13 at 3, 17-18.)

At the conclusion of the NCAA COI hearing, Chairman Friedenthal advised Plaintiff that he would have "fifteen days from the date the [COI's] report is released to accept or appeal the decision. If you accept the decision, then any penalties will be in effect from that day. If you exercise your option to appeal . . . [a]ll appealed penalties will be stayed until the adjudication of your appeal." (SUNY Docket Nos. 196-13 at 28; NCAA Docket No. 112-5 at 70.)

The NCAA COI issued a written determination in a report made public on March 21, 2001. (SUNY Docket No. 196-15.) The Committee noted that it had been "required to weigh the credibility of a large number of affidavits that were submitted by both the university and counsel for [Plaintiff] . . , some of which were from the same individuals, yet contained conflicting information." (Id. at 4.) Many of the affidavits submitted by Plaintiff were found to be less credible because "they were drafted by counsel a few days prior to the hearing, sent out for signature and returned immediately without any alterations." (Id.) Further, "the evidence submitted by the university, the conference and the enforcement staff (some of which involved affidavits) was more objective in that it did not contain the rote, 'canned' language found in the affidavits submitted on behalf of [Plaintiff]." (Id. at 17.) "Lastly, and perhaps most importantly, the committee had the opportunity to question [Plaintiff] in person during the hearing. The committee found him to be evasive, deceptive and simply not credible." (Id. at 17.)

The NCAA COI found four infractions substantiated, including a finding that Plaintiff engaged in unethical conduct, and two secondary violations. (Id.) With respect to Plaintiff, the Committee determined that the appropriate penalty would be as follows:

The former head men's basketball coach [Plaintiff] will be informed in writing by the NCAA that, due to his involvement in certain violations of NCAA legislation found in this case, if he seeks employment or affiliation in an athletically related position at an NCAA member institution during the period of time commencing with the date this report was released[,] March 21, 2001, and concluding on December 2, 2002 (three years subsequent to his release from the employ of the University at Buffalo)[,] he and the involved institution shall be requested to appear before the Division I Committee on Infractions to consider whether the member institution should be subject to the show-cause procedures of Bylaw 19.6.2.2-(1), which could limit the coach's athletically related duties at the new institution for a designated period.

(SUNY Docket No. 196-15 at 19-20.) Plaintiff was provided with a copy of the NCAA

9

Infractions Report and informed of his opportunity to appeal to the NCAA Infractions

Appeals Committee by submitting a Notice of Appeal form prior to April 4, 2001. (SUNY

Docket No. 196-15 at 1.)  The letter further informed Plaintiff that "[i]f there is no appeal,

the committee's findings of violations and penalties are effective when the 15-day appeal

period has expired or the date of April 4, 2001." (Id. at 2.)  Plaintiff timely filed a Notice of

Appeal on April 3, 2001. (SUNY Docket Nos. 196-19 at 3; 196-29 at 2; NCAA Docket No.

112-31 at 3.)

A written appeal by Plaintiff followed in which he challenged, among other things,

the penalty imposed as excessive. (SUNY Docket Nos.196-19 at 6-7; NCAA Docket No.

112-31 at 6-7.) The NCAA COI responded and Plaintiff filed a rebuttal. (SUNY Docket No.

196-19 at 3; NCAA Docket No. 112-31 at 3.) A hearing before the NCAA Division I

Infractions Appeals Committee was held on August 22, 2001. (SUNY Docket No. 196-17

(transcript); NCAA Docket No. 112-31 at 7.) Plaintiff appeared without counsel and was

permitted to make a presentation, during which time he again emphasized the allegedly

improper manner of the investigations and the credibility of the evidence against him. (See

e.g. SUNY Docket No. 196-17 at 7, 17-18, 30-43, 50-51, 53-56.) He also discussed his

statements to Mitch Gillam prior to the alleged scouting incident. (Id. at 46-47.) Plaintiff

additionally argued that, even if he was found to have committed the infractions alleged,

the punishment recommended by the NCAA COI was disproportionate to that imposed for

similar violations. (Id. at 11-12, 30-31, 43-44, 52.)  Plaintiff was also permitted a rebuttal

to the NCAA COI's response presentation. (Id. at 95-109.)

On October 12, 2001, the Appeals Committee issued a report on the issues raised

by Plaintiff in his appeal, including the argument that "a procedural error affected the

reliability of the information that was utilized to support the [infraction] committee's findings." (SUNY Docket Nos. 196-19 at 6-7; NCAA Docket No. 112-31 at 6-7.) The Appeals Committee acknowledged that "there was much conflicting evidence in the case," and the "investigators did not interview all persons who . . . [the Appeal Committee] believes[] had relevant information." (SUNY Docket No. 196-19 at 8; NCAA Docket No. 112-31 at 8.)  The Appeals Committee therefore believed "that there was additional information that would have been helpful in resolving the case." (Id.)

> As a result of the limited interviews, this case evolved into a battle of affidavits – some asserting facts giving rise to a violation and others denying facts that would give rise to a violation.  This Committee does not believe this is the most effective way to resolve factual disputes.  It is far more helpful for the NCAA enforcement staff to interview witnesses having relevant information so that they can be asked all relevant questions about the circumstances involved.  Notwithstanding these concerns about the investigation of this case, we conclude that the findings are not clearly contrary to the evidence.

> Certain language in the report of the Committee on Infractions regarding the ethical conduct violation was also troublesome to us.  The Committee on Infractions' rationale suggests that the conduct of [Plaintiff] during the hearing and in connection with affidavits submitted on his behalf contributed to the finding of an ethical conduct violation.

> We believe that it is important to state clearly that a person's assertion of innocence, however vigorous, against charges of violations should not ordinarily be the subject of an unethical conduct finding.  **In this case, the Infractions Appeals Committee does not believe the former head coach's conduct in presenting his defense should in any way give rise to an ethical conduct violation**.

(SUNY Docket Nos. 196-19 at 8-9 (emphasis added); NCAA Docket No. 112-31 at 8-9.)

With respect to Plaintiff's arguments of procedural improprieties, the Appeals Committee stated that:

> Information provided at the appeal hearing established that the NCAA

enforcement staff made information developed by the MAC available to the [Plaintiff] in a timely manner. In addition, [Plaintiff] was permitted to submit supplemental material after the deadline. The Committee does not believe there was procedural error that affected the outcome of this case.

(SUNY Docket No. 196-19 at 9-10; NCAA Docket No. 112-31 at  9-10.)

The Appeals Committee found, however, that "the show cause order of three years running from the date of [Plaintiff's] termination from employment at the institution (December 2, 2000) is excessive." (SUNY Docket No. 196-19 at 10; NCAA Docket No. 112-31 at 10.)  The Committee expressly stated:

[Plaintiff] has had a long career free of violations of NCAA legislation. In this case, the evidence was sharply conflicting. Although the Committee on Infractions made findings of violations that were supported by the evidence, we believe that a shorter show cause penalty is appropriate under the facts of this case and more consistent with penalties in previous case.

(SUNY Docket No. 196-19 at 10; NCAA Docket No. 112-31 at 10.) Accordingly, the show cause penalty was modified to terminate as of October 12, 2001, the date of the report. (SUNY Docket No. 196-19 at 10; NCAA Docket No. 112-31 at 10.)

The present litigation ensued.  In the NCAA action, Defendants moved to dismiss the § 1983 claim on the ground that they were not state actors, and to dismiss the tortious interference claim as time barred.  (NCAA Docket No. 15.) This Court granted the motion in its entirety, concluding that with respect to the § 1983 claim, the Supreme Court's decision in NCAA v. Tarkanian, 488 U.S. 179, 191, 109 S. Ct. 454, 461, 102 L. Ed. 2d 469 (1988) compelled the conclusion that the NCAA is not a state actor.  (NCAA Docket No. 30.)  On appeal, the Second Circuit affirmed the dismissal of the state law tortious interference claim, but reversed the dismissal of the § 1983 cause of action against the NCAA defendants. (Docket No. 36.) The Circuit Court rejected the conclusion that

12

Tarkanian should be interpreted "as holding categorically that the NCAA can never be a state actor when it conducts an investigation of a state school." (Id. at 6.) Instead, the Court found that the allegations "in the complaint, if proven, could show that the University wilfully participated in joint activity with the NCAA to deprive [Plaintiff] of his liberty." (NCAA Docket No. 36 at 5-6.) The matter was remanded to this Court and, following discovery, the NCAA Defendants moved for summary judgment. (NCAA Docket No. 112.)

Similarly, in the SUNY action, the SUNY Defendants moved to dismiss the 42 U.S.C. § 1983 claim as insufficient, and this Court declined to grant such relief. (SUNY Docket No. 63.) The SUNY and the MAC Defendants separately moved for summary judgment dismissing the amended complaint. (SUNY Docket Nos. 189, 197.) Judge Schroeder initially issued a report recommending that both motions be granted. (SUNY Docket No. 264.) On April 18, 2013, Judge Schroeder granted Plaintiff's renewed motion to consolidate the SUNY and NCAA actions, and informed the parties that he would issue a new Report, Recommendation and Order that would replace the prior decision and resolve all the pending summary judgment motions.

In the August 8, 2013 Report and Recommendation, Judge Schroeder granted the NCAA Defendants' motion on the ground that the NCAA was not acting under the color of state law and, alternatively, on the ground that Plaintiff's allegations were insufficient to support a claim of either substantive or procedural due process. (NCAA Docket No. 139 at 125.) Specifically, the procedural due process claim failed because "(1) the stayed show cause penalty does not constitute a tangible burden upon potential employers as required to invoke the procedural protections of the due process clause; and (2) the NCAA afforded plaintiff adequate process or, alternatively, plaintiff is a public figure with sufficient access

13

to the media to refute the allegations against him regardless of the adequacy of the process afforded by the NCAA." (Id.)

Judge Schroeder further concluded that the MAC Defendants' motion should be denied "with respect to their argument that they did not act under the color of state law." (NCAA Docket No. 139 at 100.) The Magistrate Judge found that "the MAC's investigation and report was influenced by SUNY Buffalo to such a degree that the report cannot be fairly characterized as independent of SUNY Buffalo." (NCAA Docket No. 139 at 98-100.) Nonetheless, because Plaintiff could not sustain a claim of either substantive or procedural due process, Judge Schroeder also granted the SUNY and MAC Defendants summary judgment on the § 1983 claim. (Id. at 126.) Finally, the Report recommended that the tortious interference with contract claim against the MAC Defendants be dismissed due to Plaintiff's failure to establish the elements of such a claim and because it is barred by the applicable three-year statute of limitations. (Id. at 123-125.)

## III. DISCUSSION

This Court previously referred both the SUNY Buffalo and NCAA actions to Magistrate Judge Schroeder for the purpose of, among other things, hearing and reporting upon all dispositive motions in those matters. (SUNY Docket No. 200; NCAA Docket No. 114.) Pursuant to 28 U.S.C. § 636(b)(1)(C), any party may serve and file written objections to a report and recommendation of a magistrate judge within fourteen days after being served with a copy. Local Rule of Civil Procedure 72(b) further requires that written objections to a magistrate judge's report "shall specifically identify the portions of the

14

proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority."  After *de novo* review of those portions of the report and recommendation to which proper objections are made, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." See 28 U.S.C. § 636(b)(1)(C); United States v. Gardin, 451 F. Supp. 2d 504, 506 (W.D.N.Y. 2006).

In contrast, general or perfunctory objections which are merely "a rehashing of the same arguments and positions taken in the original papers submitted to the Magistrate Judge" are improper. Camardo v. General Motors Hourly-Rate Emp. Pension Plan, 806 F.Supp. 380, 382 (W.D.N.Y. 1992)(no "second bite at the apple" will be permitted).  The district court may adopt those parts of the report to which no objection or an improper objection is raised so long as such are not clearly erroneous. Gardin, 451 F. Supp. 2d at 506.

In his submissions, Plaintiff objects to Judge Schroeder's Report and Recommendation on the grounds that: (1) there was evidence of "corrupt willful participation;" (2) the NCAA did not provide adequate process; (3) all Defendants violated his substantive due process rights; (4) the show cause penalty was imposed and upheld; (5) the show cause penalty was imposed by governmental actors; (6) the SUNY and MAC Defendants could be held liable for imposition of a material state-imposed burden of Plaintiff's rights; (7) Plaintiff's status as a public figure is irrelevant; and (8) the MAC

tortiously interfered with his contract.[1] (NCAA Docket No. 148.)

In an abundance of caution, the MAC Defendants filed objections to Judge Schroeder's report and recommendation despite the fact that they are not aggrieved by his ultimate conclusion. See generally Caidor v. Onondaga Cty., 517 F.3d 601, 604 (2d Cir. 2004) (generally, the failure to timely object to a magistrate's report waives further judicial review). The MAC Defendants object to Judge Schroeder's recommended finding that they were sufficiently engaged in joint action with SUNY Buffalo officials to be deemed state actors for the purpose of Plaintiff's § 1983 claim. (Docket No. 142.) The MAC Defendants further argue that the failure of the report to address the issue of qualified immunity was error.

**A.    Plaintiff's § 1983 Due Process Claim**

42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Section 1983 is therefore limited to only those injuries caused by state actors or those acting under color of state law. Spear v. Town of West Hartford, 954 F.2d 63, 68 (2d Cir. 1992); cert denied, 506 U.S. 819 (1992). "A private actor may be liable under § 1983 only

---

[1]Plaintiff's brief is extremely unorganized and at times incomprehensible. The final 33 pages of the brief, labeled "Part II," appears to take issue with the manner in which Judge Schroeder summarized the parties' submissions in the Report's background statement. This recitation of "distorted facts" speak generally to relevancy rather than accuracy. Further, these 'examples of distorted facts' are not presented in relation to any legal argument, and are therefore insufficient to form an appropriate objection for consideration. See Camardo, 806 F. Supp. at 382.

16

if there is a sufficiently close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." Sykes v. Bank of Am., 723 F.3d 399, 405-6 (2d Cir. 2013) (quoting Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295, 121 S. Ct. 924, 148 L. Ed. 2d 807 (2001) (internal quotation marks omitted)).

Further, liability may be imposed only for an actor's personal involvement in a constitutional tort, and may not be imposed under a theory of *respondeat superior*. See Hayut v. State Univ. of N.Y., 352 F.3d 733, 753 (2d Cir. 2003). Accordingly, private employers may not be held liable under § 1983 for the constitutional torts of their employees "unless the plaintiff proves that 'action pursuant to official . . . *policy* of some nature caused a constitutional tort.' " Rojas v. Alexander's Dep't Store, 924 F.2d 406, 409 (2d Cir. 1990), *cert denied*, 502 U.S. 809 (1991) (emphasis in original) (quoting Monell v. Dep't of Social Serv. of the City of New York, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978)); Meijia v. City of New York, 119 F. Supp. 2d 232, 275 (E.D.N.Y. 2000).

Notably, § 1983 does not itself provide a source of substantive rights, but instead provides the mechanism by which a plaintiff may seek vindication of federal rights conferred elsewhere. Graham v. Connor, 490 U.S. 386, 393-94, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). Here, Plaintiff is alleging that Defendants acted jointly to deprive him of his liberty interest in his good name and reputation without due process of law in violation of his substantive and procedural due process rights guaranteed by the Fourteenth Amendment. (SUNY Docket Nos. 55 ¶ 7; 246 at 8; NCAA Docket Nos. 1 ¶¶ 48-50; 131 at 9.) "To formulate a claim under the Due Process Clause of the Fourteenth

17

Amendment, a plaintiff must demonstrate that he or she possesses a constitutionally protected interest in life, liberty, or property, and that state action has deprived him or her of that interest." Valmonte v. Bane, 18 F.3d 992, 998 (2d Cir. 1994); see U.S. Const. amend. XIV, § 1.

### 1.    Procedural Due Process

A procedural due process claim is analyzed in two steps: " 'the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.' " Valmonte, 18 F.3d at 998 (quoting Kentucky Dep't of Corr. v. Thompson, 490 U.S. 454, 460, 109 S. Ct. 1904, 1908, 104 L. Ed. 2d 506 (1989)). Here, Judge Schroeder correctly concluded that this claim failed as a matter of law.

### i. Stigma Plus

With respect to the first step, "[a] person's interest in his or her good reputation alone, apart from a more tangible interest, is not a liberty of property interest sufficient to invoke the procedural protections of the Due Process Clause or create a cause of action under § 1983." Patterson v. City of Utica, 370 F.3d 322, 329-30 (2d Cir. 2004); see Siegert v. Gilley, 500 U.S. 226, 233, 111 S. Ct. 1789, 114 L. Ed. 2d 277 (1991) (defamation by itself is a tort actionable under state law, not a constitutional deprivation). Instead, "an action can be grounded in 42 U.S.C. § 1983 when that plaintiff can demonstrate a stigmatizing statement plus a deprivation of a tangible interest." Vega v. Lantz, 596 F.3d 77, 81 (2d Cir. 2010). Such a cause of action is commonly referred to as a "stigma-plus" claim. Patterson, 370 F.3d at 330.

"To establish a 'stigma plus' claim, a plaintiff must show (1) the utterance of a

18

statement sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false, and (2) a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights." Vega, 596 F.3d at 81 (internal quotation marks omitted).  Although the "plus" requirement is not clearly defined, it does not include "the deleterious effects which flow directly from a sullied reputation" such as "the impact that defamation might have on job prospects, or, for that matter, romantic aspirations, friendships, self-esteem, or any other typical consequence of a bad reputation." Valmote, 18 F.3d at 1001; see Davis v. N. N.Y. Sports Officials' Council, No. No. 7:09-CV-0514 (GTS/GHL), 2010 WL 3909688, *8 (N.D.N.Y. Sept. 30, 2010).

Plaintiff asserts that the "plus" in this case is the NCAA's imposition of a " 'show cause' order,[2] which, along with the 'unethical conduct' charge and [Plaintiff's] placement on the NCAA's 'Pink File,' permanently marred [his] professional employment record." (SUNY Docket No. 246 at 18; NCAA Docket No. 131 at 33.) A requirement that a prospective employer show good cause before hiring a plaintiff has been found a sufficient burden on future employment to satisfy the plus requirement. See Valmote, 18 F.3d at 1001 (plaintiff's inclusion on child abuse and maltreatment registry and requirement that prospective child-care employers show good cause for hiring her constituted sufficient burden on future employment).

Judge Schroeder concluded as much, but nonetheless found that the plus requirement was not satisfied because "the show cause penalty was stayed for the

---

[2]Plaintiff's resignation took place more than 3 years prior to the commencement of either action, therefore any claim that his employment termination satisfied the 'plus' requirement is barred by the applicable statute of limitations. See generally Hogan v. Fischer, 738 F.3d 509, 517 (2d Cir. 2013).

duration of its imposition," and therefore it could not "be said to have imposed a tangible burden upon any potential employer." (Docket No. 139 at 115.) Plaintiff objects to this conclusion on the grounds that the "show cause penalty was not vacated" and the imposition of this penalty remains part of NCAA records. (Docket No. 148 at 20-25.) This Court disagrees.

Plaintiff was informed at both the NCAA COI hearing and in the letter providing him with the March 21, 2001 Infractions report that he had fifteen days in which to exercise his right to appeal the decision, during which time no penalty would go into effect. (SUNY Docket Nos. 196-15 at 1-2; 196-13 at 28; NCAA Docket No. 112-5 at 70.) If Plaintiff did exercise his appeal rights, "[a]ll appealed penalties [would] be stayed until the adjudication of [his] appeal." (SUNY Docket Nos. 196-13 at 28; NCAA Docket No. 112-5 at 70.) Because Plaintiff timely filed a notice of appeal prior to the end of the fifteen-day period, the show cause penalty was stayed for the duration of the proceedings before the NCAA Appeals Committee. (SUNY Docket Nos. 196-19 at 3; 196-29 at 2; NCAA Docket No. 112-31 at 3.) At the conclusion of those proceedings, the NCAA Appeals Committee modified the show cause penalty to terminate as of October 12, 2001, the date of the Committee's decision. (SUNY Docket No. 196-19 at 10; NCAA Docket No. 112-31 at 10.)

Accordingly, Judge Schroeder correctly concluded that the show cause order was stayed for the duration of its existence. As such, there was never any actual or potential burden on prospective employers that would amount to a tangible, state-imposed interference with Plaintiff's future employment. Vega, 596 F.3d at 81; Cf. Valmonte, 18 F.3d at 1001. Without this added 'plus,' the record of the show cause penalty's existence amounts to no more than stigmatizing statements which are by themselves insufficient to

20

establish a constitutional deprivation. See Siegert, 500 U.S. at 233; Patterson, 370 F.3d at 329-30.

Further, the material burden or alteration of the plaintiff's status or rights must be *state* imposed. See Vega, 596 F.3d at 81. Contrary to Plaintiff's further objections (Docket No. 148 at 25-29), Judge Schroeder correctly concluded that neither the SUNY nor the MAC Defendants could be held liable for imposing the show cause order. (NCAA Docket Nos. 139 at 115-117.) Inasmuch as can be discerned, Plaintiff argues that the NCAA must be considered a state actor because it "adopted the tainted SUNY/MAC investigation." (Docket No. 148 at 28.) He relies on Velez v. Levy in support of his argument that the stigma and the plus need not issue from the same actor. 401 F.3d 75 (2d Cir. 2005). There, the Second Circuit found that, in the context of a motion to dismiss, a sufficient stigma plus claim was stated where a university chancellor terminated the plaintiff's employment following stigmatizing statements made about her by board members. Velez, 401 F.3d at 90. The Court reasoned that "the board members imposed a 'stigma' and asked for a 'plus,' and that the [c]hancellor, against the backdrop of, and based upon, the board members' statements, imposed the very same 'plus' requested by the board members, thereby adopting the 'stigma.' " Id. Accordingly, this case does not support the conclusion that the adoption of stigmatizing statements made by state officials alone transforms a private entity into a state actor. Instead, the entity imposing the 'plus' in Velez, the university, was already a state actor.

Plaintiff also argues that Velez supports the conclusion that the SUNY and MAC Defendants could be found liable for the plus because they had the " 'power to provide process to the [P]laintiff,' " but "deliberately misused that power." (Docket No. 148 at 28

21

(quoting Velez, 401 F.3d at 93 (declining to impose liability on board members who did not have the power to provide pre-termination process).) Although these Defendants did have the authority to provide process with respect to the underlying allegations – and Defendants argue that they did in fact provide such process – only the NCAA could have provided an opportunity to be heard with respect to the show cause order that it imposed. Moreover, as discussed further below, the NCAA Committee on Appeals ultimately did not adopt the MAC investigation, or even that of the NCAA COI.

### ii. Adequate Process

The second step of a procedural due process analysis "examines whether the procedures attendant upon that deprivation were constitutionally sufficient.' " Valmonte, 18 F.3d at 998. The availability of adequate process defeats a stigma-plus claim. Segal v. City of N.Y., 459 F.3d 207, 213 (2d Cir. 2006). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." Morrissey v. Brewer, 408 U.S. 471, 481, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972); Monserrate v. N.Y. State Senate, 599 F.3d 148, 158 (2d Cir. 2010). " 'The touchstone of due process, of course, is the requirement that a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to meet it.' " Monserrate, 599 F.3d at 158 (quoting Spinelli v. City of N.Y., 579 F.3d 160, 169 (2d Cir. 2009)).

Plaintiff objects to the conclusion that "the NCAA provided [him] access to their case file, as well as additional information from the MAC investigation which [P]laintiff requested." (NCAA Docket No. 139 at 120; see NCAA Docket No. 148 at 17.) He also argues that the withholding of these materials evidences corrupt, willful collusion between the NCAA and SUNY Buffalo. (NCAA Docket No. 148 at 6-11.) The allegedly withheld

materials are notes made by Defendant William Maher in connection with the original SUNY self-report to MAC prior to Plaintiff's resignation and "the two different November 16, 1999 reports (MAC 18 and MAC 20)." (NCAA Docket No. 148 at 17.)  Plaintiff does not explain how this specifically prejudiced the NCAA proceedings against him.[3]  See Monserrate, 599 F.3d at 159-60 (a plaintiff need not be given copies of all materials considered by a decision maker so long as he "received sufficient opportunity to clear his name").  Further, it is undisputed that Plaintiff received a copy of the MAC 18 report in November 1999. (SUNY Docket No. 196-5 at 11-12.)  He was also informed of the alleged scouting violation involving Mitch Gillam prior to SUNY's self report of this allegation and its inclusion in the MAC 20 report. (SUNY Docket Nos. 196-5 at 107-116; 241 at 41-42), and disputed his culpability for the same in both the MAC and NCAA proceedings.  (SUNY Docket Nos. 196-3 at 44-45; 255 ¶ 24; 196-8 at 17-18, 62-67; 196-17 at 45-48.)

This Court also rejects Plaintiff's conclusory assertion that, because a question of fact was found with respect to the MAC Defendants' alleged joint action with SUNY officials,  there must also be "a question of fact as to whether NCAA enforcement staff adopted an investigation they knew was improper," thereby denying Plaintiff adequate process. (NCAA Docket No. 148 at 16-19.)  The alleged improprieties in both the MAC and the NCAA COI's investigation were raised by Plaintiff before the NCAA Appeals Committee.  That Committee, which did not include any named individual Defendant,

---

[3]Although not included in his present objections, Plaintiff argued in opposition to summary judgment that Maher's notes "would have clearly shown Sidney Brown's (as well as other witnesses') inconsistent statements." (SUNY Docket No. 246 at 29 n. 21.)  However, Plaintiff was well aware of these inconsistencies, as evidenced by the "battle of affidavits" which resulted during the various proceedings. (SUNY Docket Nos. 196-19 at 8-9.)  Indeed, Plaintiff specifically discussed Sidney Brown's exculpatory statements before the NCAA COI. (SUNY Docket No. 196-12 at 49.)

credited several of these arguments in reducing Plaintiff's penalty. (SUNY Docket No. 196-19 at 8-9; NCAA Docket No. 112-31 at 8-9.) The fact that Plaintiff ultimately did not obtain the full relief sought from the Appeals Committee does not mean that the afforded process was inadequate.

### 2.   Substantive Due Process

Plaintiff argues that Defendants violated his substantive due process rights by "arbitrarily and capriciously depriv[ing] him of his liberty right to be employed as a head NCAA basketball coach." (NCAA Docket No. 148 at 19-20.) A valid substantive due process claim may be based on evidence of governmental conduct that " 'is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.' " Velez, 401 F.3d at 93 (quoting Cnty. of Sacramento v. Lewis, 523 U.S. 833, 847 n. 8, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998)). However, "where a specific constitutional provision prohibits government action, plaintiffs seeking redress for that prohibited conduct in a § 1983 suit cannot make reference to the broad notion of substantive due process." Velez, 401 F.3d at 94; see Conn v. Gabbert, 526 U.S. 286, 293, 119 S. Ct. 1292, 143 L. Ed. 2d 399 (1999) (same).

Here, Plaintiff perfunctorily asserts that his substantive due process claim is supported by the "shocking plethora of egregious conduct" documented elsewhere in his submissions. (NCAA Docket No. 148 at 20.) In other words, this claim is supported by the same allegations on which his procedural due process claim rests. Where what is shocking about a defendant's alleged actions is his or her motive to deprive the plaintiff of liberty without procedural due process, a substantive due process claim must either be subsumed in the more particular procedural due process claim or must fail. Velez, 401 F.3d at 94.

24

Accordingly, Judge Schroeder correctly concluded that "even if [Plaintiff's] allegations were supported by the record, such a claim would sound in procedural, rather than substantive, due process." (NCAA Docket No. 139 at 105.) Plaintiff's reliance on Board of Regents v. Roth does not call this conclusion into question, inasmuch as there the Supreme Court considered only the issue of procedural due process. 408 U.S. 564, 569, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972); see Conn, 526 U.S. at 291 (recognizing the same).

### 3.     Plaintiff's Status as a Public Figure

Plaintiff also objects to Judge Schroeder's alternative conclusion that because Plaintiff was a public figure with sufficient access to the media, Defendants' were entitled to summary judgment regardless of the adequacy of the NCAA proceedings. (NCAA Docket Nos. 139 at 121-23; 148 at 29-31.)   As recognized in the Report and Recommendation, "[w]hen a public figure has access to the media, a post-deprivation hearing is not necessarily required because the option of calling a press conference to refute any allegations is available." D'Allesandro v. City of Albany, No. 04-CV-788, 2008 WL 544701, *14 (N.D.N.Y. Feb. 26, 2008) (citing Baden v. Koch, 799 F.2d 825, 832 (2d Cir. 1986) ("With his high degree of access to the news media, Baden did not need a formal hearing as a forum in which to repeat his side of the story.  As a public figure, he could presumably have called a press conference and provided any further defense of his record or explanation of his removal from office that he desired to give.")).

Plaintiff argues that his public figure status is irrelevant because Defendants withheld material exculpatory evidence from him, therefore his ability to "speak to the press has little bearing if he is unaware that exculpatory evidence even existed." (NCAA Docket No. 148 at 30.)  As concluded above, Plaintiff has not shown that Defendants withheld any

25

information from him that he was not otherwise aware of from other sources. This argument is therefore without merit.

This Court nonetheless declines to adopt the recommendation of the Magistrate Judge on this issue. A plaintiff's status as a public figure is a relevant factor in determining how much process is due. See generally Spinelli v. City of N.Y., 579 F.3d 160, 170 (2d Cir. 2009) (sufficient process is determined by weighing private and governmental interests along with the risk of erroneous deprivation) (citing Mathews v. Eldridge, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976)).  However, it is not alone determinative.  For example, in Baden, the Second Circuit found that the plaintiff "had already performed the function of [a formal name-clearing] hearing, refuting the charges against him both privately to his employer and publicly when his written refutations were published along with the statements critical of his performance." 799 F.2d at 832.  Thus, "the benefits to Baden of a trial-type hearing would have been marginal at best in view of the less formal process that had been provided to him." Id. at 832-33.  In addition, "[a]s a public figure, he could presumably have called a press conference and provided any *further* defense of his record or explanation of his removal from office that he desired to give." Id. at 832 (emphasis added); see D'Allessandro, 2008 WL 544701 at *13-14 (no deprivation of process where the plaintiff had access to the media *in addition* to opportunities to testify before the Albany Common Council and an adequate post-deprivation procedure by way of a New York Civil Procedure Law Article 78 proceeding).

Further, the 'plus' at issue in these stigma-plus cases was a prior employment termination. As such, the plaintiffs' statements to the press could arguably be sufficient to overcome any reluctance of a prospective employer to hire the plaintiff that may have been

caused by the defendant's stigmatizing statements. Here, however, if Plaintiff had not had

the opportunity to challenge the show cause order before the NCAA Appeals Committee,[4]

which he did successfully, a prospective employer would still have been burdened with

showing good cause to hire Plaintiff even if that employer completely accepted his

published version of events. Accordingly, although Plaintiff's status as a public figure

weighs in favor of the conclusion that he was afforded adequate process, it is not a

sufficient independent basis for granting summary judgment to Defendants.

    4.    <u>Tortious Interference with Contract</u>

    Finally, Plaintiff argues that Judge Schroeder erred in recommending dismissal of

his state law tortious interference claim against the MAC Defendants. (NCAA Docket No.

148 at 31-33.)

> Under New York law, the elements of tortious interference with contract are
> (1) "the existence of a valid contract between the plaintiff and a third party";
> (2) the "defendant's knowledge of the contract"; (3) the "defendant's
> intentional procurement of the third-party's breach of the contract without
> justification"; (4) "actual breach of the contract"; and (5) "damages resulting
> therefrom."

<u>Kirch v. Liberty Media Corp.</u>, 449 F.3d 388, 401 (2d Cir. 2006) (quoting <u>Lama Holding Co.</u>

<u>v. Smith Barney Inc.</u>, 88 N.Y.2d 413, 424, 668 N.E.2d 1370, 1375 (1996)). This cause of

action is governed by a three-year statute of limitations, and "generally accrues when an

injury is sustained, not discovered."[5] <u>American Fed. Group, Ltd. v. Edelman</u>, 282 A.D.2d

---

[4]Because the process afforded by the Appeals Committee was sufficient, this Court need not, and does not, comment on the sufficiency of the NCAA COI hearing.

[5]The Magistrate Judge relies on <u>Chevron Corp. v. Donziger</u> for the assertion that a tortious interference with contract claim accrues on the date of the alleged interference. 871 F. Supp. 2d 229, 257 (S.D.N.Y. 2012). Although <u>Chevron</u> discusses interference with a contract, the New York case on which it relies was discussing the statute of limitations for a claim of tortious interference with prospective economic advantage. <u>Thome v. Alexander & Louisa Calder Found.</u>, 70 A.D.3d 88, 108, 890 N.Y.S.2d 16,

279, 279, 722 N.Y.S.2d 870 (N.Y.A.D. 1st Dep't 2001) (claim accrued no later than the date employment contract was terminated); see Kronos v. AVX Corp., 81 N.Y.2d 90, 94, 612 N.E.2d 289, 292 (1993) ("no cause of action for tortious inducement to breach a contract arises until actual damages are sustained"); Andrew Greenberg, Inc. v. Svane, 36 A.D.3d 1094, 1099, 830 N.Y.S.2d 358 (N.Y.A.D. 3d Dep't 2007) (date damages are sustained, and not date of defendant's wrongful act or discovery of injury, determines when claim accrues).

Here, Plaintiff alleges that the MAC Defendants interfered with his "valid written contract of employment" with SUNY Buffalo and his December 3, 1999 resignation agreement. (SUNY Docket No. 55 ¶¶ 164, 172, 175.)  Any alleged interference with the employment contract is barred by the statute of limitations, inasmuch as that contract terminated with Plaintiff's resignation on December 3, 1999, and the action against the MAC Defendants was not commenced until January 17, 2003. (SUNY Docket Nos. 55-1, 194 at 5-7); see American Fed. Group, 282 A.D.2d at 279.

Further, Plaintiff concedes that no express provision of the resignation agreement was breached.  He argues instead that the "MAC Defendants intentionally interfered with the implied covenant of good faith" in the resignation agreement. (SUNY Docket No. 246 at 49-50.)  "Implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance." Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 389, 663 N.E.2d 289, 291 (1995).  This implied obligation is "a pledge that neither party shall do anything

---

30 (N.Y.A.D. 1st Dep't 2009) (noting distinction in accrual dates between contract and prospective economic advantage torts), *lv denied*, 15 N.Y.3d 703 (2010).  The New York Court of Appeals has recognized that "inducing breach of a binding agreement and interfering with a nonbinding 'economic relation' can both be torts, but that the elements of the two torts are not the same" Carvel Corp. v. Noonan, 3 N.Y.3d 182, 189, 818 N.E.2d 1100 (2004).

which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Id. (internal quotation marks omitted). Plaintiff has not alleged any interference with his rights under the resignation agreement. Indeed, as the MAC Defendants argue, this agreement specifically contemplates that Plaintiff would be afforded an opportunity to respond to the MAC allegations, and he in fact filed such a response. (SUNY Docket Nos. 194 at 5; 196-6; 197-1 at 62.) Any alleged improprieties in the subsequent investigations do not call into question SUNY Buffalo's performance of any obligation to Plaintiff under the resignation agreement, therefore there is no evidence of an actual breach. See Kronos, 81 N.Y.2d at 94 (no claim unless actual, rather than nominal, damages result from the alleged breach). This cause of action was properly dismissed.

## B.   The MAC Defendant's Objections

As noted above, although they are not aggrieved by the Magistrate Judge's ultimate conclusion, the MAC Defendants object to Judge Schroeder's recommended finding that they were sufficiently engaged in joint action with SUNY Buffalo officials to be deemed state actors for the purpose of Plaintiff's § 1983 claim, as well as the failure of the report to address the issue of Defendant Fournier's qualified immunity. (NCAA Docket No. 142.)

### 1.   Joint Action

The MAC Defendants object to Judge Schroeder's finding that "[w]hile the Court finds the evidence of a conspiracy to be lacking, it is persuaded that [the] SUNY Buffalo defendants were sufficiently involved in the substance of MAC's investigation and reporting of the alleged NCAA violations so as to warrant a finding that the MAC engaged in joint action with SUNY Buffalo." (NCAA Docket Nos. 139 at 98, 142 at 5.)

29

The actions of a nominally private person are attributable to the state when, as relevant here, "the private party 'acted in concert with the state actor *to commit an unconstitutional act*,' i.e., the private defendant was 'a willful participant in joint activity with the State or its agents.' " Missere v. Gross, 826 F. Supp. 2d 542, 566-67 (S.D.N.Y. 2011) (emphasis added) (quoting Ciambriello v. Cnty. of Nassau, 292 F.3d 307, 324 (2d Cir. 2002)). "The touchstone of joint action is often a plan, prearrangement, conspiracy, custom, or policy shared by the private actor and the [state actor]." Missere v. Gross, 826 F. Supp. 2d at 567 (quoting Forbes v. City of N.Y., No. 05–CV–7331, 2008 WL 3539936,*5 (S.D.N.Y. Aug. 12, 2008)); see Ginsberg v. Healey Car & Truck Leasing, Inc., 189 F.3d 268, 272 (2d Cir. (2d Cir. 1999).

In light of this, the Magistrate Judge's finding that the MAC engaged in joint action with SUNY Buffalo appears to conflict with the conclusion in the same sentence that "evidence of a conspiracy [is] lacking." (NCAA Docket No. 139 at 98.) Further, the fact that "the MAC's investigation was influenced by SUNY Buffalo" (NCAA Docket No. 139 at 98) is not the same as concluding that the MAC Defendants knowing and willfully participated in any inappropriate use of SUNY Buffalo's authority, thereby warranting the imposition of liability under § 1983.

Nonetheless, there is certainly evidence from which a jury could have concluded, for example, that Defendant Fournier knowingly and willingly participated with SUNY Buffalo officials in the procurement and selective presentation of evidence against Plaintiff. (See e.g. SUNY Docket Nos. 217 ¶ 13 (averment that Fournier told student athlete "that other players had testified against [Plaintiff] and that if [the student's] testimony differed from theirs, [the student] was threatening [his] scholarship and eligibility due to NCAA Rule

30

10.1); 255 ¶¶ 16-19 (Fournier removed certain prior student affidavits from the MAC 20 report and "inadvertently failed to change the date").) Resolution of the credibility issues raised by the conflicting statements, sometimes from the same witness, and other evidence in the record would be a task best left to a jury. This Court therefore adopts Judge Schroeder's recommendation to deny that part of the MAC Defendants' motion seeking summary judgment on the ground that they did not act under the color of state law, but not the conclusive finding that these Defendants were in fact engaged in joint action with SUNY Buffalo for the purpose of liability under § 1983.

    2.   <u>Qualified Immunity</u>

    Although the MAC Defendants' effort to preserve this argument in the event of an appeal is understandable, this Court declines to address the issue of Defendant Fournier's qualified immunity. " 'Without an underlying constitutional violation, qualified immunity cannot attach.' " <u>J.E. ex rel. Edwards v. Ctr. Moriches Union Free Sch. Dist.</u>, 898 F. Supp. 2d 516, 559 (E.D.N.Y. 2012) (quoting <u>Cathedral Church of the Intercessor v. The Incorporated Vil. of Malverne</u>, 353 F. Supp. 2d 375, 391 (E.D.N.Y. 2005)). Further, there is a threshold question whether qualified immunity is even available to Defendant Fournier that is not addressed in the MAC Defendants' briefs. <u>See</u> <u>Mejia v. City of New York</u>, 119 F. Supp. 2d 232, 260 (E.D.N.Y. 2000) (the possibility of a private actor's "§ 1983 immunity does not automatically follow § 1983 liability").

## IV. CONCLUSION

    This Court has reviewed *de novo* those portions of Judge Schroeder's August 8, 2013 Report and Recommendation to which sufficiently specific objections have been

made, and otherwise reviewed the report for clear error. The Court now accepts the Report and Recommendation with the exception of the conclusion that Plaintiff's status as a public figure constituted a sufficient independent basis for granting all Defendants summary judgment, and the conclusive finding that the MAC Defendants were engaged in joint action with SUNY Buffalo.

## V. ORDERS

IT HEREBY IS ORDERED that the MAC Defendants' Objections (NCAA Docket No. 142) are GRANTED in part and DENIED in part;

FURTHER, that Plaintiff's Objections (NCAA Docket No. 148) are DENIED;

FURTHER, that the August 8, 2013 Report and Recommendation of Judge Schroeder (NCAA Docket No. 139) is MODIFIED to the extent stated above and otherwise ACCEPTED;

FURTHER, that Defendants' Motions for Summary Judgment (SUNY Docket Nos. 189, 197; NCAA Docket No. 112) are GRANTED and the complaints against them dismissed;

FURTHER, that the Clerk of the Court shall close this case.

SO ORDERED.

Dated:  March 23, 2014
        Buffalo, New York

/s/William M. Skretny
WILLIAM M. SKRETNY
Chief Judge
United States District Court

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

TIMOTHY M. COHANE,

                                Plaintiff,

        vs.                                          Civ. No. 1:04-CV-0181-WMS

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION, et al.,

                                Defendants.

## NOTICE OF APPEAL

**NOTICE IS HEREBY GIVEN** that Timothy M. Cohane, plaintiff in the above-caption case, hereby appeals to the United States Court of Appeals for the Second Circuit from each and every part of the District Court Judgment entered on March 28, 2014 (ECF Doc. No. 168) and each and every part of the District Court Decision and Order, entered March 28, 2014 (Doc. No. 167), that granted defendants motions for summary judgment and that denied Plaintiff's Objections; that granted MAC defendant objections; that accepted the August 8, 2013 Report and Recommendation of Magistrate Judge Schroeder (Doc. No.139); That Modified the Report and Recommendation to the extent stated in the Decision and Order (Doc. No. 167) and otherwise Accepted the August 8, 2013 Report and Recommendation of Magistrate Judge Schroeder;

        Plaintiff appeals from that portion of the aforesaid Judgment; Decision and Order and Report and Recommendation which is adverse to plaintiff.

Dated:  April 25, 2014

                                        Respectfully submitted,


                                        By:___/s/Sean O'Leary_____
                                        Sean O'Leary, Esq.

Attorney for Plaintiff
320 Old Country Road, Suite 104
Garden City, New York 11530
solearylaw@aol.com
Phone: (516) 741-8203
Fax: (516) 741-8206

TO:

William C. Odle Esq
Spencer, Fane, Britt & Browne,
1400 Commerce Bank Building, 1000 Walnut Street,
Kansas City, MO 64106-2140,
*Attorneys for Defendants NCAA, Tom Hosty, Stephanie Hannah and Jack
Freidenthal*

Lawrence J. Vilardo, Esq.,
Connors & Vilardo, LLP,
1000 Liberty Building, 424 Main Street,
 Buffalo, NY 14202,
*Attorneys for Defendants NCAA, Tom Hosty, Stephanie Hannah and Jack
Freidenthal*

Kim S. Murphy, Esq.,
NYS Attorney General's Office
Main Place Tower, Suite 300A
350 Main Street, Buffalo, NY 14202
716-853-8477        Fax: 716-853-8571
Email: kim.murphy@oag.state.ny.us
*Attorneys for Defendants William Greiner,Dennis Black,Robert Arkielpane,
Eric Eisenberg and William Maher*

Robert Todd Hunt, Esq.,
Walter & Haverfield LLP
The Tower at Ereiview
1301 E. Ninth Street, Suite 3500, Cleveland, OH 44114-1821
216-928-2935        Fax: 216-916-2372
Email: rthunt@walterhav.com
*Attorneys for Defendants Mid American Conference and
Robert Fournier*

2